Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
John P. Mulvaney, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

                Plaintiffs,

      -against-

BHARGAV PATEL, M.D.
PATEL MEDICAL CARE, P.C., and
JOHN DOE DEFENDANTS "1"-"10,"

             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants Bhargav Patel, M.D., Patel Medical Care,

P.C., and John Doe Defendants "1"-"10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.    This action seeks to recover more than $711,000.00 that Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault

insurance charges relating to medically unnecessary, experimental, excessive, illusory, and otherwise unreimbursable healthcare services, including initial consultations, initial and follow-up examinations, outcome assessment testing ("OAT"), radial pressure wave therapy ("RPWT") that was falsely billed as extracorporeal shockwave therapy ("ESWT"), nerve conduction velocity ("NCV") testing, and electromyography ("EMG") studies (collectively, the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by GEICO ("Insureds").

2.      In combination with John Doe Defendants "1"-"10" ("John Doe Defendants"), Defendant Patel Medical Care, P.C. ("Patel Medical") and its owner, Defendant Bhargav Patel, M.D. ("Patel"), engaged in a widescale fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone approximately $3.4 million for the alleged performance of the Fraudulent Services from four (4) separate locations (the "Clinics") from August 2019 through the present.  Notably, Patel Medical submitted more than five thousand (5,000) separate claim submissions to GEICO seeking payment of no-fault insurance benefits for the Fraudulent Services, some of which contained forged signatures of Insureds to create the appearance that the Insured had signed at the time they received the billed-for services when, in fact, the Insured did not because no services were rendered at all. Further, all the claim submissions represented that Patel was allegedly the "treating provider" who performed the Fraudulent Services when, in truth, many of the Fraudulent Services were performed by unlicensed technicians, not Patel, and without any supervision by Patel or another licensed healthcare provider. Finally, critical to the fraudulent scheme, Patel and Patel Medical, with the assistance of the John Doe Defendants, entered into illegal kickback and referral arrangements in order to gain

access to a steady stream of patients on which to perform the Fraudulent Services at the Clinics, which thereby enabled Patel Medical to submit charges for the Fraudulent Services to GEICO.

3.    In addition to recovering the money Defendants wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $2,253,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Patel Medical because:

(i)    the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    the billing codes used for the Fraudulent Services misrepresented and/or exaggerated the level, nature, and necessity of the services that purportedly were provided to inflate and/or unbundle the charges submitted to GEICO;

(iii)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and using illegal kickback arrangements; and

(iv)    in many cases, the Fraudulent Services – to the extent provided at all – were not performed by Patel or Patel Medical's employees, but by independent contractors, some of whom were not licensed in any healthcare profession and rendered services without any supervision by Patel.

4.    The Defendants fall into the following categories:

(i)    Defendant Patel Medical is a New York professional corporation, through which the Fraudulent Services were purportedly performed and billed to GEICO;

(ii)    Defendant Patel is a physician licensed to practice medicine in the State of New York, who purports to own Patel Medical and who purported to perform all the Fraudulent Services; and

(iii)    John Doe Defendants are unlicensed individuals and/or entities not presently identifiable that knowingly participated in the fraudulent scheme by assisting with the operation of Patel Medical and the provision of medically unnecessary services; facilitating the illegal kickback arrangements by establishing relationships with healthcare providers or individuals who had access to patients at the Clinics; "brokering" or

3

"controlling" access to patients in exchange for illegal kickback payments; and/or helping to design and/or implement the pre-determined fraudulent protocols carried out through Patel Medical for the purpose of maximizing Defendants' profits without regard to genuine patient care.

5.      As discussed herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and/or exaggerated the nature, level, and necessity of services that purportedly were provided in order to inflate and/or unbundle the charges submitted to GEICO; (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services – to the extent provided at all – were not performed by Patel or Patel Medical's employees, but instead performed by independent contractors, some of whom were not licensed in any healthcare profession and rendered services without any supervision by Patel.

6.      As such, Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

7.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO through Patel Medical.

8.      The Defendants' fraudulent scheme has continued uninterrupted through the present day, as Patel Medical continues to actively bill GEICO and seek collection on pending charges for the Fraudulent Services.

4

9.      As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $711,000.00.

## THE PARTIES

**I.      Plaintiffs**

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.      Defendants**

11.      Defendant Patel resides in and is a citizen of New York. Patel was licensed to practice medicine in New York on July 3, 2015 and is the owner of Patel Medical. In coordination with John Doe Defendants, Patel used Patel Medical to submit fraudulent billing to GEICO.

12.      Defendant Patel Medical is a New York professional corporation incorporated on or about July 19, 2019, with its principal place of business in New York.

13.      Upon information and belief, John Doe Defendants reside in and are citizens of New York. John Doe Defendants are individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of Patel Medical and the provision of medically unnecessary services; facilitating the illegal kickback arrangements by establishing relationships with healthcare providers or individuals who had access to patients at the Clinics; "brokering" or "controlling" access to patients in exchange for illegal kickback payments; and/or helping to design and/or implement the pre-determined fraudulent protocols carried out through Patel Medical for the purpose of maximizing Defendants' profits without regard to genuine patient care.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§ 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interests and costs, and is between citizens of different states.

15.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought

under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"]

Act) because they arise under the laws of the United States. In addition, this Court has

supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to

28 U.S.C. § 1367.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern

District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint

occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

17.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement**

18.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle

accidents have an efficient mechanism to pay for and receive the health care services that they need.

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§

5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)

(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide

Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

19.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

20.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

21.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

22.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

23.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

24.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

25.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

26.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

27.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

28.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

29.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and/or local laws, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

30.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

>       An insurer shall pay benefits for any element of loss … directly to the applicant or ...
>       upon assignment by the applicant ... shall pay benefits directly to providers of health

care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

31.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

32.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

33.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

34.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    **Defendants' Fraudulent Scheme**

### A.    **Overview of the Scheme**

35.     Beginning in 2019, and continuing through the present day, Patel and Patel Medical, with the aid of the John Doe Defendants, masterminded and implemented a complex fraudulent scheme in which Patel Medical was used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, excessive, illusory, and/or otherwise non reimbursable healthcare services.

36.     The Fraudulent Services billed through Patel Medical were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

37.     Patel and Patel Medical, to obtain access to patients (i.e., Insureds) at the Clinics, entered into illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals, including John Doe Defendants, who controlled access to patients at the Clinics and/or were responsible for "brokering" access to patients who would be steered to the Clinics.

38.     Pursuant to Patel and Patel Medical's illegal kickback and referral arrangements, Patel and/or Patel Medical made, or caused to be made, payments to unlicensed laypersons and/or healthcare professionals, including John Doe Defendants, in exchange for access to patients who were treated, or purported to be treated, at the Clinics and/or in exchange for patients who would be steered to the Clinics.

39.     Patel and Patel Medical thereafter subjected Insureds at the Clinics to various medically unnecessary and illusory healthcare services, including cookie-cutter examinations and consultations performed as part of Defendants' pre-determined treatment and billing protocol, purported diagnostic tests with no clinical basis, and purported "shockwave" therapy services that

were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

40.     To carry out the fraudulent scheme, Patel and Patel Medical took many steps to conceal its true nature and extent. For example, the bills submitted by Patel Medical all represented that Patel was the "treating provider" when, in fact, Patel, rarely, if ever performed many of the Fraudulent Services. Instead, many of the Fraudulent Services were performed by unlicensed technicians who rendered services without any supervision by Patel.

41.     Defendants' scheme also included billing for services that were never rendered. For example, Patel Medical routinely submitted billing indicating that Patel Medical performed many sessions of ESWT per Insured. Contrary to Patel Medical's billing submissions, multiple Insureds informed GEICO that they either never received ESWT or received treatment far less often than indicated by the billing Patel Medical submitted.

42.     In keeping with the fact that Defendants billed for services that were never rendered, Patel Medical's claim submissions routinely contained documents purportedly signed by the Insured at the time they allegedly received treatment when, in fact, the Insured's signature was forged. The following chart contains examples of forged Insured signatures submitted by Patel Medical and provides comparison signatures showing how the same Insured's signature appeared on documents submitted to GEICO by other healthcare providers, which are shown under the headings "Example 1" and "Example 2":

11

| Insured Initials | Example 1 | Example 2 | Forged signature submitted by Patel Medical |
|---|---|---|---|
| C.A | | | |
| H.V. | | | |
| S.L. | | | |
| P.J. | | | |
| L.B. | | | |
| M.C. | | | |
| J.U. | | | |
| N.L. | | | |
| M.W. | | | |
| D.G. | | | |

43.     The above chart is only a representative sample of forged Insured signatures submitted by Patel Medical. Indeed, signatures of many of the Insureds whose claims are listed in Exhibit "1" were forged on documents submitted to GEICO by Patel Medical.

44.     Moreover, the forged Insured signatures submitted by Patel Medical were not limited to a single document for each Insured. For many of Insureds whose claims are listed in Exhibit "1," Patel Medical submitted numerous documents bearing a forged Insured signature.

45.     For example, a forged signature for Insured "H.V." appears on at least 20 different documents that Patel Medical submitted to GEICO.  Below is a representative example of Insured H.V.'s signature as it appeared on documents submitted by other healthcare providers followed by a chart containing a non-exhaustive list of examples where Patel Medical submitted documents bearing a forged signature for Insured H.V.:

| Example of Insured H.V.'s typical signature | ██████████████ |
|---|---|

| **Document Submitted by Patel Medical** | **Forged Signatures for Insured H.V.** |
|---|---|
| Assignment of Benefits Form dated 4/21/2021 | ████████ |
| Outcome Assessment Report dated 5/25/2021 | █████████ |
| Outcome Assessment Report dated 7/16/2021 | █████████ |
| ESWT Therapy Note dated 10/28/2021 | ██████ |
| ESWT Therapy Note dated 10/27/2021 | ██████ |
| ESWT Therapy Note dated 11/5/2021 | ██████ |
| ESWT Therapy Note dated 11/6/2021 | ██████ |
| ESWT Therapy Note dated 11/10/2021 | ███████ |
| ESWT Therapy Note dated 11/9/2021 | ██████ |

| | |
|---|---|
| ESWT Therapy Note dated 11/17/2021 | ███████ |
| ESWT Therapy Note dated 11/18/2021 | ███████ |
| ESWT Therapy Note dated 12/1/2021 | ███████ |
| ESWT Therapy Note dated 12/2/2021 | ███████ |
| ESWT Therapy Note dated 12/9/2021 | ███████ |
| ESWT Therapy Note dated 12/8/2021 | ██████ |
| ESWT Therapy Note dated 12/15/2021 | ███████ |
| ESWT Therapy Note dated 12/16/2021 | ███████ |
| ESWT Therapy Note dated 12/17/2021 | ██████ |
| ESWT Therapy Note dated 12/22/2021 | ███████ |
| ESWT Therapy Note dated 12/18/2021 | ███████ |

46.     Notably, Patel appeared on behalf of Patel Medical for an examination under oath ("EUO") where he provided demonstrably false testimony involving several topics, including the topic of Insured signatures. In that regard, Patel testified that, as part of the initial patient visit, he: (i) personally gives an assignment of benefits form to every patient; and (ii) each patient signs the assignment of benefits in front of Patel in the examination room. Demonstrating that Patel's EUO testimony is patently false, forged Insured signatures appear on many assignment of benefits forms submitted to GEICO by Patel Medical.

47.     At its core, the essential characteristics of Defendants' fraudulent scheme involved: (i) payment of illegal kickbacks in exchange for patients that Defendants could use to bill for the Fraudulent Services; (ii) implementation of pre-determined treatment and billing protocols designed to enrich Defendants without regard for genuine patient care, which resulted in performance of medically unnecessary services and/or billing for services that were never rendered; and (iii) use of independent contractor unlicensed "technicians" to allegedly render many

of the Fraudulent Services, falsely representing that Patel personally performed or oversaw the performance of these Fraudulent Services, when in fact he rarely, if ever, did so.

**B.      The Illegal Kickback and Referral Relationships at the Clinics**

48.    Patel and Patel Medical, in order to obtain access to the Clinics' patient base (i.e., Insureds) and in coordination with John Doe Defendants, entered into illegal kickback and referral arrangements with unlicensed persons and/or healthcare professionals, including John Doe Defendants, who "brokered" or "controlled" access to patients who were treated, or purported to be treated, at the Clinics.

49.    Patel operated Patel Medical from the following New York Clinic locations:

(i)      85-55 Little Neck Parkway, Floral Park;
(ii)     250-20 Hillside Avenue, Bellerose;
(iii)    420 Doughty Boulevard, Inwood; and
(iv)     700 Rockaway Turnpike, Lawrence.

50.    Patel did not have his own patients at the Clinics and did nothing to create a legitimate patient base.

51.    Patel did not market the existence of Patel Medical or the Fraudulent Services to the general public.

52.    Patel did not advertise for patients, did not maintain any website, and never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of any of Patel Medical.

53.    Patel did virtually nothing that would be expected of the owner of a legitimate medical professional corporation to develop its reputation and attract patients to the Clinics.

54.    For example, the Clinic located at 85-55 Little Neck Parkway, Floral Park (the "Floral Park Clinic") is a residential building owned by Patel that he allegedly converted into a medical office in 2020. However, other than a small sign on the door that is not clearly visible

from the street, Patel did nothing to the exterior of the building to indicate to the public that it is a medical office. The following is an image of the exterior of the Floral Park Clinic as it appeared on October 15, 2021:



55.     In keeping with the fact that Patel and Patel Medical obtained patients at the Floral Park Clinic pursuant to illegal kickback and referral arrangements, Patel Medical submitted over $1.2 million in billing to GEICO based on Fraudulent Services purportedly rendered from the Floral Park Clinic alone despite the fact that: (i) Patel Medical did not advertise itself or the Floral Park Clinic to the general public; (ii) the Floral Park Clinic looks like a residential building; (iii)

the Floral Park Clinic lacks any signage that is clearly visible to passersby indicating that the Floral Park Clinic is a medical office; and (iv) the Floral Park Clinic lacks a parking lot and is located on a busy road with limited street parking.

56.     In further keeping with the fact that Insureds were steered to the Floral Park Clinic as a result Patel and Patel Medical's illegal kickback and referral arrangements, Patel and Patel Medical, in coordination with John Doe Defendants, paid a transportation company to transport Insureds directly to the Floral Park Clinic, even though Patel testified that he did not know crucial details regarding the transportation company.

57.     Specifically, at the EUO of Patel Medical, Patel claimed that he did not know: (i) who owns the transportation company; (ii) any contact person at the transportation company; or (iii) how much Patel Medical pays the transportation company. Patel testified that he knew only the transportation company's name and that he learned about it because the same transportation company was being used to transport patients at the 420 Doughty Boulevard, Inwood location (the "Inwood Clinic").

58.     Upon information and belief, Patel - who prior to opening the Floral Park Clinic was already paying illegal kickbacks to access patients at the Inwood Clinic - realized that he could grow his illicit profits further by capitalizing on the fact that he owned a residential building in Floral Park. As a result, Patel entered into similar kickback and referral arrangements as the controllers of the Inwood Clinic, with the end result being that patients were steered to the Floral Park Clinic by unlicensed individuals, including John Doe Defendants, and transported there directly by the transportation company - obviating the need for visible exterior signage, advertising, marketing, patient parking, and any legitimate efforts to obtain patients at the Floral Park Clinic.

59.     In keeping with the fact that Patel and Patel Medical entered into illegal kickback and referral arrangements to obtain patients at the Clinics, at least one other healthcare provider at the Clinics has accused of paying illegal kickbacks in exchange for patient referrals.

60.     Specifically, Ross A. Fialkov, D.C. ("Fialkov") - a chiropractor who treated Insureds at the Inwood Clinic and Floral Park Clinic during the same time period as Patel and Patel Medical - and several of his professional corporations have been sued for no-fault insurance fraud by GEICO and another insurer based on allegations that, among other things, Fialkov paid kickbacks to laypersons in exchange for patient referrals. See Gov't Employees Ins. Co., et al. v. Fialkov, et al., 21-cv-4039 (E.D.N.Y.) (alleging that Fialkov and several of his professional corporations paid kickback to laypersons and sham billing companies); State Farm Mut. Auto. Ins. Co., et al. v. Tandingan P.T., P.C., et al., 22-cv-1582 (E.D.N.Y.). Underlying GEICO's fraud allegations is that fact that Fialkov, who purported to treat many Insureds whose claims are listed in Exhibit "1," has paid more than $100,000.00 to Artur Sattarov ("Sattarov"), a layperson who has been under indictment for, among other things, bank fraud and money laundering. See United States v. Rasulov, et al., 20-cr-653 (S.D.N.Y.).

61.     As a result of the illegal kickback and referral arrangements, the healthcare services that Patel and Patel Medical could provide to the patients at the Clinics were generally limited and dictated by the unlicensed laypersons and/or healthcare professionals, including John Doe Defendants, who controlled access to patients at the Clinics and were interested only in maximizing profits without regard to genuine patient care.

62.     Neither Patel nor any other medical professional who may have rendered services under the name of Patel Medical at the Clinics had a genuine doctor-patient relationship with the Insureds that visited the No-Fault Clinics.

63.     In truth, the Insureds were simply directed by unlicensed laypersons and/or healthcare professionals associated with the Clinics to subject themselves to treatment by whatever individual was working for Patel Medical and the other healthcare providers present on any given day, because of the illegal kickbacks paid by the Defendants and pursuant to Defendants' predetermined treatment and billing protocols.

64.     The financial arrangements that Patel and Patel Medical entered into with unlicensed individuals and/or healthcare professionals who "brokered" or "controlled" access to patients, including John Doe Defendants, were "pay-to-play" arrangements that caused individuals to steer Insureds to Patel Medical so that Patel Medical could submit billing to GEICO and other insurers for the medically unnecessary Fraudulent Services allegedly performed at the Clinics.

65.     Patel and Patel Medical made the various kickback payments in exchange for having Insureds referred to one or more of Patel Medical for the Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

66.     The amount of money that Defendants paid in kickbacks generally was based on the volume of Insureds that were steered to Patel Medical for the Fraudulent Services.

67.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

68.     Patel knew at all times that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

69.     In sum, Patel and Patel Medical, with the assistance of the John Doe Defendants, gained access to patients through illegal kickback and referral arrangements with unlicensed

laypersons and/or healthcare professionals who "brokered" or "controlled" access to patients, including John Doe Defendants, so that Patel and Patel Medical could subject Insureds to the Fraudulent Services, solely because of the illegal kickbacks paid by Patel and Patel Medical.

**C.    The Defendants' Fraudulent Treatment and Billing Protocol**

70.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, Patel Medical purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol—to the extent any services were performed at all—without regard for the Insureds' individual symptoms or presentation.

71.    Each step in Patel Medical's fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

72.    Defendants' fraudulent treatment and billing protocol resulted in more than $3.4 million in billing to GEICO for medically unnecessary, experimental, excessive, illusory and/or bogus services, initial consultations, initial and follow-up examinations, outcome assessment testing ("OAT"), radial pressure wave therapy ("RPWT") that was falsely billed as extracorporeal shockwave therapy ("ESWT"), nerve conduction velocity ("NCV") testing, and electromyography ("EMG") studies (*i.e.*, the "Fraudulent Services").

73.    No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. Rather, the Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1. The Fraudulent Charges for Initial Consultations and Examinations

74.     Upon receiving a referral pursuant to the kickbacks that Patel and Patel Medical paid to the unlicensed laypersons and/or healthcare professionals who "brokered" or "controlled" access to patients, including the John Doe Defendants, the Defendants purported to provide nearly all of the Insureds in the claims identified in Exhibit "1" with an initial consultation or examination.

75.     In keeping with the fact that the initial consultations and examinations were performed pursuant to the kickbacks that Patel and Patel Medical paid at the Clinics, Patel Medical virtually always purported to perform the initial consultations and examinations at the Clinics, rather than at any stand-alone practice.

76.     The initial consultations and examinations were performed as a "gateway" in order to provide a false basis to justify the Defendants' exploitation of the Insureds through Patel Medical's respective medically unnecessary, excessive, experimental, and/or illusory services.

77.     In keeping with the fact that Patel Medical's initial consultations and examinations were not genuine but simply a means to justify their ability to bill for additional services pursuant to a predetermined, fraudulent treatment protocol, the initial consultations and examinations resulted in nearly all of the Insureds receiving at least one of other Fraudulent Services from Patel and Patel Medical, with Insureds often receiving lengthy courses of treatment that generated tens of thousands of dollars of billing for Patel Medical per Insured.

78.     According to Patel Medical's billing submissions, all of the initial consultations and examinations were performed personally by Patel, which were then billed to GEICO through Patel Medical.

79.     Patel Medical billed the majority of its initial encounters with Insureds as initial consultations with the remainder billed as initial examinations. Patel Medical billed all of its initial

consultations under CPT code 99245, typically resulting in a charge of $299.25 or $410.08. Patel Medical billed all of its initial examinations under CPT code 99204, typically resulting in a charge of $148.69 or $203.76.

80.     The charges for the initial consultations and examinations were fraudulent in that the examinations and consultations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that the Defendants paid at the Clinics in coordination with the John Doe Defendants, not to treat or otherwise benefit the Insureds.

81.     Furthermore, Patel Medical's charges for the initial consultations and examinations were fraudulent in that it misrepresented the nature and extent of the initial consultations and examinations.

82.     For example, in every claim identified in Exhibit "1" for initial consultations and examinations under CPT codes 99245 and 99204, Patel Medical misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

83.     The use of CPT code 99245 typically requires that a healthcare professional spend 80 minutes of face-to-face time with the Insured or the Insured's family.

84.     The use of CPT code 99204 typically requires that a healthcare professional spend 45 minutes of face-to-face time with the Insured or the Insured's family.

85.     Though Patel Medical billed all of its respective initial consultations and examinations under CPT codes 99245 and 99204, Patel rarely spent 45 minutes, let alone 80 minutes, on an initial consultation or examination.

86.     Rather the initial consultations and examinations in the claims identified in Exhibits "1" typically required 10 to 15 minutes to complete and rarely lasted more 30 minutes.

87.    In keeping with the fact that Patel Medical's respective initial consultations and examinations rarely lasted more than 30 minutes, Patel Medical's respective purported initial consultations and examinations were documented using pre-printed checklist or templated forms.

88.    The pre-printed checklist or template forms that Patel and Patel Medical used in conducting the initial consultations and examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

89.    All that was required to complete the pre-printed checklist or templated forms was a brief patient interview and a perfunctory physical examination of the Insureds.

90.    The interview and physical examinations allegedly conducted by Patel Medical did not require Patel, or any physician, to spend more than 10 to 15 minutes of face-to-face time with the Insureds during the putative initial consultations and examinations.

91.    Pursuant to the Fee Schedule, when Patel and Patel Medical submitted charges for initial consultations and examinations under CPT codes 99245 and 99204, or caused them to be submitted, they falsely represented that Patel and Patel Medical: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity" (when using CPT code 99204) or "high complexity" (when using CPT code 99245).

92.    In addition, in each of the bills it submitted under CPT code 99245, Patel Medical misrepresented that it performed a "consultation" when, in fact, it did not meet the Fee Schedule's requirements to do so.

**a.    Misrepresentations Regarding the Performance of Consultations**

93.     Pursuant to the Fee Schedule, the use of CPT code 99245 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

94.     However, Patel and Patel Medical did not provide their purported "consultations" – to the extent that they are provided at all – pursuant to a legitimate referral from any other physician or other appropriate source. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed as a result of the illegal kickback payments and pursuant to the Defendants' fraudulent treatment protocol in order to generate billing for Patel Medical.

95.     In keeping with the fact that Patel and Patel Medical did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were neither transmitted back to any referring physicians or other appropriate sources, nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans, or otherwise acted upon in any way.

96.     In further keeping with the fact that Patel and Patel Medical did not provide their "consultations" at the request of another physician or appropriate source, Patel Medical's "consultation" was often the first patient encounter that an Insured had with any physician, and sometimes any healthcare provider, at the Clinics, making it highly improbable that any physician or appropriate source requested a that Patel Medical perform a "consultation."

97.     Moreover, there is virtually no documentation in any of Patel Medical's claim submissions to GEICO identifying the supposed physician or appropriate source that requested a "consultation" regarding any of the Insureds whose claims are listed in Exhibit "1."

98.     Pursuant to the Fee Schedule, the use of CPT code 99245 to bill for a patient consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

99.     However – and, again, in keeping with the fact that Patel and Patel Medical did not provide their purported "consultations" at the request of another physician or appropriate source – Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

100.    In the claims for purported "consultations" identified in Exhibit "1," Patel and Patel Medical misrepresented the underlying services to be consultations billable under CPT code 99245 because such consultations are reimbursable at a higher rate than commensurate patient examinations.

**b.      Misrepresentations Regarding "Comprehensive" Patient Histories**

101.    Pursuant to the Fee Schedule, when Patel and Patel Medical submitted charges for initial consultations and examinations under CPT codes 99245 and 99204, they represented that they took a "comprehensive" patient history.

102.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

103.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

104. The CPT Assistant recognizes the following organ systems with respect to a review of systems:

> i. constitutional symptoms (<u>e.g.</u>, fever, weight loss);
>
> ii. eyes;
>
> iii. ears, nose, mouth, throat;
>
> iv. cardiovascular;
>
> v. respiratory;
>
> vi. gastrointestinal;
>
> vii. genitourinary;
>
> viii. musculoskeletal;
>
> ix. integumentary (skin and/or breast);
>
> x. neurological;
>
> xi. psychiatric;
>
> xii. endocrine;
>
> xiii. hematologic/lymphatic; and
>
> xiv. allergic/immunologic.

105. When Patel and Patel Medical billed for the initial consultations and examinations under CPT codes 99245 and 99204, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial consultations.

106. In fact, Patel and Patel Medical did not take a "comprehensive" patient history from the Insureds they purported to treat during the initial consultations and examinations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

107.    Rather, after purporting to provide the initial consultations and examinations, Patel and Patel Medical simply prepared reports containing ersatz patient histories which consisted of a cursory past medical history and listing the Insureds' subjective complaints of pain stemming from the motor vehicle accident.

### c.    Misrepresentations Regarding "Comprehensive" Physical Examinations

108.    Pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

109.    Further, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

110.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

> (i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;
>
> (ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;
>
> (iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);
>
> (iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;
>
> (v)     examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

111.    When Patel Medical billed for the initial consultations and examinations under CPT code 99245 and 99204, it falsely represented that it performed a "comprehensive" patient examination on the Insureds he purported to treat during the initial consultations and examinations.

112.    In fact, Patel Medical did not conduct a general examination of multiple patient organ systems or conduct a complete examination of a single patient organ system.

113.    For instance, Patel Medical did not conduct any general examination of multiple patient organ systems, inasmuch as it did not document findings with respect to at least eight organ systems.

114.    Furthermore, although Patel Medical often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial consultations and examinations, the musculoskeletal examinations did not qualify as "complete," because they failed to properly document:

(i)      the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(ii)     examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)    palpation of lymph nodes in neck, axillae, groin, and/or other location; and/or

(iv)    examination of gait and station.

        **d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

115.    Similarly, when Patel Medical submitted charges for initial consultations and examinations under CPT codes 99245 and 99204, it represented that it engaged in medical decision-making of "moderate complexity" (in the case of CPT code 99204) or "high complexity" (in the case of CPT code 99245).

116.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

117.    Though the Defendants routinely falsely represented that their initial consultations and examinations involved medical decision-making of "moderate complexity" or "high complexity," in actuality the initial consultations and examinations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with injuries or symptoms with any degree of complexity, the deficient initial consultations and examinations were incapable of assessing and/or diagnosing them as such.

118.    First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints to the extent that they ever had any complaints arising from automobile accidents at all.

119.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Patel Medical, to the

extent that Patel Medical provided any such diagnostic procedures or treatment options in the first instance.

120.    In almost every instance, any diagnostic procedures and "treatments" that Patel Medical actually provided were limited to either a series of medically unnecessary diagnostic tests or experimental and investigational ESWT, none of which were health or life-threatening if properly administered.

121.    Second, Patel Medical did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

122.    In fact, no healthcare professional associated with Patel Medical engaged in any medical decision-making at all. Rather, the outcome of the initial consultations and examinations were pre-determined for virtually every Insured to result in boilerplate "diagnoses" that merely: (i) matched the patients' subjective complaints; and (ii) added diagnoses that would justify performance of the particular Patel Medical's fraudulent services.

123.    For example, the result of Patel Medical's initial consultations and examinations routinely included diagnoses of cervical and/or lumbar sprains and strains and cervical and/or lumbar radiculopathy to justify future charges for additional treatment, including Patel Medical's future billing of EMG/NCV studies and ESWT.

124.    In sum, the initial consultations and examinations were not performed to address the Insureds' individualized circumstances but instead were designed solely to support the Fraudulent Services that Patel Medical purported to perform and then billed to GEICO and other insurers.

## 2. The Fraudulent Charges for Follow-Up Examinations

125. In addition to their fraudulent initial consultation and examinations, Patel Medical purported to subject most Insureds in the claims identified in Exhibit "1" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

126. Patel Medical typically billed its follow-up examinations to GEICO under CPT code 99214, typically resulting in a charge of $92.97 or $127.41.

127. Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the illegal kickback and financial arraignments, referral schemes and fraudulent treatment protocol.

128. The charges for the follow-up examinations also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

129. For example, CPT code 99214 require that a physician typically spend 25 minutes of face-to-face time with the Insured or the Insured's family. Here, however, neither Patel nor any healthcare professional associated with Patel Medical spent any significant amount of time with the Insureds or their families during the follow-up examinations. Rather, as with the initial consultations and examinations, Patel Medical used a boilerplate template and checklist form in an attempt to medically justify the ongoing laundry-list of Fraudulent Services to which the Insureds were and would be subjected.

130. In keeping with the fact that the follow-up examinations were performed as a matter of course rather than to actually evaluate the progress of the Insureds, Patel Medical simply

documented in almost every follow-up examination that the Insured should continue with their current treatment plan and physical therapy.

131.    Further demonstrating that the follow-up examinations were performed solely to generate billing and not based on the needs of any specific patient, Patel Medical, on over 800 occasions, billed for follow-up examinations that were allegedly performed less than two weeks after the prior follow up examination without any indication in the follow-up examination report or any of the other Insured's medical records as to why the Insured needed to be seen again by Patel Medical less than two weeks after the prior follow-up examination.

132.    In fact, on over 150 occasions, Patel Medical billed for a follow-up examination that was purportedly performed less than five days after the Insured's prior follow-up examination, and sometimes even the day after the prior follow-up examination—to the extent any of the follow-up examinations were performed at all. For example:

(i)    On March 18, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured TR. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured just 1 day later, on March 19, 2021. Then, on March 20, 2021, again without any apparent justification, Patel Medical billed for third follow-up examination that was allegedly performed on the same Insured just 1 day after the second follow-up examination.

(ii)    On December 13, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured FB. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured just 1 day later, on December 14, 2021.

(iii)    On March 22, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured LB. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured just 1 day later, on March 23, 2021.

(iv)    On April 15, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured JF. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured <u>just 1 day later</u>, on April 16, 2021.

(v)     On November 4, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured KM. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured <u>just 1 day later</u>, on November 5, 2021.

(vi)    On June 18, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured RAF. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured <u>just 1 day later</u>, on June 19, 2021.

(vii)   On July 16, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured HV. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured <u>just 1 day later</u>, on July 17, 2021.

(viii)  On September 24, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured SH. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured <u>just 1 day later</u>, on September 25, 2021.

(ix)    On March 4, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured IP. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured <u>just 1 day later</u>, on March 5, 2021.

(x)     On March 22, 2021, Patel Medical billed for a follow-up examination that was purportedly performed on Insured MC. Without any apparent justification, Patel Medical billed for another follow-up examination that was allegedly performed on the same Insured <u>just 1 day later</u>, on March 23, 2021.

### 3.      The Fraudulent Charges for Outcome Assessment Testing

133.    In addition to the initial consultations and examinations and follow-up examinations, Patel Medical, in many of the claims listed in Exhibit "1", also subjected Insureds

to medically unnecessary OAT, often on or about the same dates it purportedly subjected Insureds to a follow-up examination.

134.    Patel Medical billed the OAT submitted to GEICO using CPT code 99358, typically resulting in charges of $204.41 or $280.12 for each session of OAT.

135.    In the vast majority, if not all, of the claims for OAT that Patel Medical submitted to GEICO, Patel Medical represented that Patel allegedly performed the OAT.

136.    Like Patel Medical's charges for the other Fraudulent Services, the charges for the OAT were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to Defendants' illegal kickback and referral arrangements as well as their fraudulent treatment and billing protocols.

137.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's follow-up examinations, and since the OAT that Patel Medical purportedly provided was nothing more than a questionnaire regarding each Insured's history and physical condition, the Fee Schedule provides that the OAT should have been reimbursed as an element of the patient's follow-up examinations.

138.    In other words, healthcare providers cannot conduct and bill for follow-up examinations and then bill separately for contemporaneously provided OAT.

139.    In the event Patel Medical did perform the OAT that it billed to GEICO, the information gained using the OAT would not have been significantly different from the information that the Patel Medical purported to obtain during the patient history and physical examinations it purported to perform as part of virtually every Insured's follow-up examination. In fact, Patel Medical, in its billing for fraudulent follow-up examinations under CPT code 99214,

represented that it took at least a "detailed" patient history and performed a "detailed" physical examination.

140.    The OAT represented purposeful and unnecessary duplication of the patient histories and physical examinations purportedly conducted during the Insureds' follow-up examinations. In that regard, the OAT were part and parcel of the Defendants' overall fraudulent scheme, inasmuch as the "service" was rendered – to the extent rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich Defendants and in no way aided in the assessment and treatment of the Insureds.

141.    The Patel Medical's use of CPT code 99358 to bill for the OAT also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

142.    Though the Patel Medical routinely submitted billing under CPT code 99358 for OAT, neither Patel nor any healthcare professional associated with Patel Medical spent an hour reviewing or administering the tests or communicating with the Insureds or their families.

143.    Indeed, the OAT did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds with the results then input into a computer program by clerical staff on behalf of Patel Medical.

144.    In fact, Patel Medical did not even bother to prepare a narrative report summarizing the test results. Instead, Patel Medical submitted the computerized data with no indication that Patel or any healthcare professional associated with Patel Medical performed any services whatsoever in connection with the OAT, let alone an hour of prolonged services.

145.    Unsurprisingly, since the OAT was medically unnecessary and performed pursuant to the Patel Medical's pre-determined fraudulent treatment protocols and illegal kickback and referral arrangements, the results of the OAT, like the other Fraudulent Services, was not incorporated into the Insureds' respective treatment plans.

### 4.    The Fraudulent Charges for Electrodiagnostic Testing (NCV/EMG)

146.    Based upon the fraudulent, pre-determined "diagnoses" that they purported to provide to Insureds during the purported initial consultations and examinations, Patel and Patel Medical, purported to subject many of the Insureds in the claims identified in Exhibit 1 to a series of medically unnecessary electrodiagnostic tests, specifically NCV and EMG tests (collectively, the "electrodiagnostic" or "EDX" tests).

147.    Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to kickbacks that Patel and Patel Medical, in coordination with the John Doe Defendants, paid in exchange for access to patients, not to treat or otherwise benefit the Insureds.

### a.    The Human Nervous System and Electrodiagnostic Testing

148.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

149.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

150.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

151.    The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

152.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

153.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

154.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

155.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

       **b.**     **Patel Medical's "Upper Extremity Study First" EDX testing protocol**

156.    Patel Medical purportedly rendered EDX testing pursuant to a "cookie cutter" testing protocol whereby nearly all Insureds on whom Patel Medical performed EDX testing received either: (i) an upper extremity EDX test only; or (ii) an upper extremity EDX test on one date of service followed by a lower extremity EDX on a second date of service.

157.    For example:

(i)     On May 8, 2021, Patel Medical purported to provide an Insured named SL with an upper extremity EDX test. Then, on June 26, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(ii)    On February 13, 2021, Patel Medical purported to provide an Insured named RV with an upper extremity EDX test. Then, on February 20, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(iii)   On August 21, 2021, Patel Medical purported to provide an Insured named NG with an upper extremity EDX test. Then, on October 2, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(iv)    On November 25, 2020, Patel Medical purported to provide an Insured named MP with an upper extremity EDX test. Then, on December 12, 2020, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(v)     On April 10, 2021, Patel Medical purported to provide an Insured named RH with an upper extremity EDX test. Then, on May 1, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(vi)    On February 27, 2021, Patel Medical purported to provide an Insured named DA with an upper extremity EDX test. Then, on March 6, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(vii)   On February 13, 2021, Patel Medical purported to provide an Insured named TR with an upper extremity EDX test. Then, on March 20, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(viii)   On June 26, 2021, Patel Medical purported to provide an Insured named PJ with an upper extremity EDX test. Then, on August 21, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(ix)   On February 20, 2021, Patel Medical purported to provide an Insured named MC with an upper extremity EDX test. Then, on March 13, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

(x)   On April 17, 2021, Patel Medical purported to provide an Insured named GD with an upper extremity EDX test. Then, on April 24, 2021, Patel Medical purported to provide the same Insured with a lower extremity EDX test. Patel Medical billed a total of approximately $2,115.92 for these tests.

158.   There is no clinical requirement that an upper extremity EDX test be rendered prior to performing a lower extremity EDX test.

159.   Similarly, the Recommended Policy does not contain any guidance suggesting that upper extremity EDX tests should be rendered prior to performing lower extremity EDX tests.

160.   To the contrary, the Recommended Policy is clear that EDX testing should be tailored based on the circumstances of each individual patient.

161.   There is no legitimate clinical justification for Patel Medical's EDX testing protocol whereby an upper extremity EDX test is almost always performed first, with a lower extremity EDX test following thereafter for Insureds who received a second EDX test.

162.   Indeed, Patel Medical's claim submissions for EDX testing are improbable to the point of medical impossibility inasmuch as nearly every Insured who received EDX testing from Patel Medical allegedly needed an upper extremity EDX test and then separately needed a lower extremity EDX test on a different date of service following the upper extremity EDX test.

163.   In truth, Patel Medical's "Upper Extremity Study First" EDX testing protocol was a product its fraudulent scheme and based on Defendants' "cookie cutter" predetermined treatment

protocol designed to maximize profit and that was implemented without regard to whether any Insured actually needed any EDX testing at all.

164.   In keeping with the fact that Patel Medical sought to maximize its profits without regard to patient care, Patel Medical's "Upper Extremity Study First" EDX testing protocol was ostensibly carried out to ensure that Patel Medical's EDX testing protocol would be relatively easy to implement by the technicians who allegedly performed the NCV portion of the EDX testing and to make it easier for Patel Medical to fraudulently unbundle its NCV charges.

### c.   Legitimate NCV Tests

165.   NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

166.   An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude") and calculates the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

167.   In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

168.   There are several motor and sensory peripheral nerves in the arms and legs that can be assessed with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be evaluated with NCV tests.

169. F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

170. According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of two sensory nerves; (ii) NCV tests of three motor nerves; and (iii) two H-reflex studies.

171. Prior to October 1, 2020, assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed health care professionals in the metropolitan New York area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test is performed; (ii) $166.47 under CPT code 95903 for each motor nerve with F-wave in any limb on which NCV testing is performed; and (iii) $119.99 under CPT code 95934 for each H-reflex test that is performed on the nerves of any limb.

172. As of October 1, 2020, when changes to the Fee Schedule went into effect for New York no-fault insurance claims, the Fee Schedule requires providers to submit billing for NCV testing under one CPT code based on the number of nerves tested. For example, the Fee Schedule permits licensed healthcare professionals in the metropolitan New York area to submit a maximum charge of $653.46 under CPT code 95913 for NCV testing of 13 or more nerves.

**d.    The Fraudulent Charges for NCV Tests**

173.    Patel Medical, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, routinely: (i) purported to perform testing on far more nerves than recommended by the Recommended Policy: (ii) tested several nerves that are rarely tested in legitimate clinical practice; and (iii) "unbundled" its NCV charges pursuant to a predetermined treatment and billing protocol whereby it fraudulently rendered an excessive number of NCV tests (28 in total per Insured) split up over the course of two dates of service, so that Patel Medical could justify billing under CPT code 95913 for each date of service.

174.    Of the Insureds who were subjected to Patel Medical's NCV testing, the vast majority received NCV tests of nerves in both their upper and lower extremities (i.e., all four limbs).

175.    Prior to October 1, 2020, Patel Medical submitted billing to GEICO for NCV testing concerning exactly five Insureds. For each of these five Insureds, Patel Medical performed the exact same NCV testing protocol, specifically: (i) NCV tests of 8 motor nerves; (ii) NCV tests of 10 sensory nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies.

176.    Critically, all of the NCV tests that Patel Medical performed on these five Insureds consisted of both upper and lower extremity studies that were allegedly rendered on a single date of service. And, while such NCV testing was still far in excess of the Recommended Policy, Patel Medical's NCV tests of these five Insureds did not include NCV tests of multiple nerves that are rarely tested in legitimate clinical practice.

177.    After October 1, 2020, Patel Medical—which could no longer bill for NCV tests "per nerve" under the Fee Schedule—changed its EDX treatment and billing protocols for the sole purpose of fraudulently maximizing the charges it could submit to GEICO and other insurers, without regard to legitimate patient care or the patient's individual circumstances.

178.    Indeed, after October 1, 2020, Patel Medical never again billed GEICO for upper and lower extremity studies performed on a single date of service. Instead, Patel Medical implemented an NCV testing protocol whereby it would perform only an upper extremity study only or only a lower extremity study on a single date of service. For the vast majority of Insureds whom Patel Medical subjected to both an upper extremity study and a lower extremity, Patel Medical allegedly performed nearly all of these Insureds' NCV studies over two dates of service, typically a week to two months apart.

179.    Patel, in coordination with the John Doe Defendants, intentionally and knowingly changed Patel Medical's NCV billing and treatment protocols to split NCV testing over two dates of service for the purpose of maximizing the amount Patel Medical could bill under the Fee Schedule. As noted above, after October 1, 2020, the maximum amount permitted by the Fee Schedule for NCV testing on a single date of service was $653.46 for NCV tests of 13 or more nerves under CPT code 95913.

180.    In that regard, based solely on the changes to the Fee Schedule and without any legitimate clinical purpose, Patel, in coordination with the John Doe Defendants, fraudulently devised and implemented an NCV testing protocol whereby Patel Medical significantly increased the total number of nerves it tested per upper extremity study and lower extremity study such that Patel Medical could bill for NCV tests of 13 or more nerves under CPT code 95913 when performing: (i) only an upper extremity study; and (ii) only a lower extremity study.

181.    In other words, after October 1, 2020, when Patel Medical performed both an upper extremity study and a lower extremity to an Insured over the course of two dates of service—which it did on the vast majority of Insureds—Patel Medical billed for two units of CPT code

95913 per Insured, whereas the prior NCV testing protocol it used prior to October 1, 2020 would have only allowed Patel Medical to bill for one unit of CPT code 95913 per Insured.

182.    Though it would be exceptionally rare in legitimate clinical practice for a practitioner to perform NCV tests of 13 or more nerves for a single upper extremity study or a single lower extremity study to a single patient, Patel Medical did precisely that in virtually every upper extremity study and virtually every lower extremity study that it allegedly rendered to Insureds.

183.    Specifically, after October 1, 2020, Patel Medical routinely, over the course of two dates of service, subjected Insureds to: (i) NCV tests of 14 motor nerves (6 per upper extremity study and 8 per lower extremity study); (ii) NCV tests of 14 sensory nerves (8 per upper extremity study and 6 per lower extremity study); (iii) multiple F-wave studies; and (iv) at least two H-reflex studies, resulting in a total of 28 nerves tested per Insured who received both an upper and lower extremity NCV.

184.    As noted above, for each Insured who received both an upper and lower extremity NCV, Patel Medical almost always rendered an upper extremity NCV test on the first date of service and a lower extremity NCV test on the second date of service, enabling it to unbundle its charges under CPT code 95913.

185.    For example:

      (i)    On May 8, 2021, Patel Medical purported to provide an Insured named SL with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on June 26, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(ii)     On February 13, 2021, Patel Medical purported to provide an Insured named RV with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on February 20, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(iii)    On August 21, 2021, Patel Medical purported to provide an Insured named NG with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on October 2, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(iv)     On November 25, 2020, Patel Medical purported to provide an Insured named MP with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on December 12, 2020, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(v)      On April 10, 2021, Patel Medical purported to provide an Insured named RH with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on May 1, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(vi)     On February 27, 2021, Patel Medical purported to provide an Insured named DA with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on March 6, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(vii)    On February 13, 2021, Patel Medical purported to provide an Insured named TR with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on March 20, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(viii)   On June 26, 2021, Patel Medical purported to provide an Insured named PJ with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on August 21, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(ix)    On February 20, 2021, Patel Medical purported to provide an Insured named MC with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on March 13, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

(x)    On April 17, 2021, Patel Medical purported to provide an Insured named GD with an upper extremity NCV test consisting of: (i) 8 sensory nerve NCV tests; and (ii) 6 motor nerve NCV tests with F-wave studies, which was billed under CPT code 95913. Then, on April 24, 2021, Patel Medical purported to provide the same Insured with a lower extremity NCV test consisting of: (i) 6 sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies, which was also billed under CPT code 95913.

186.    In keeping with the fact that Patel and Patel Medical, in coordination with the John Doe Defendants, increased the number of nerves on which they performed NCV tests pursuant to the fraudulent scheme, Patel Medical's post-October 1, 2020, NCV testing protocol included several nerves that are rarely tested in legitimate clinical practice because NCV tests of such nerves

are either not justified absent specific clinical concerns or are not warranted because the nerves tested are duplicative of NCV testing of another nerve that is already being tested.

187.    Specifically, after October 1, 2020, Patel Medical, in virtually every upper extremity study that it allegedly rendered to Insureds, purportedly performed NCV tests of the following nerves that are rarely tested in legitimate clinic practice: (i) radial motor nerve; and (ii) dorsal ulnar cutaneous sensory nerve.

188.    Further, after October 1, 2020, Patel Medical, in virtually every lower extremity study that it allegedly rendered to Insureds, purportedly performed NCV tests of the following nerves that are rarely tested in legitimate clinic practice: (i) saphenous sensory nerve; (ii) lateral plantar motor nerve; and (iii) medial plantar motor nerve.

189.    NCV testing of the radial motor nerve is rarely performed in legitimate clinical practice because such testing is typically only indicated when the practitioner suspects radial neuropathy because the patient presents with a rare condition known as "wrist drop" or "finger drop," characterized by the patient's wrist or finger hanging limply because the patient is unable to lift or extend their hand at the wrist or their finger at the joint.

190.    Despite being rarely warranted in legitimate clinical practice, Patel Medical purportedly performed an NCV test of the radial motor nerve of virtually every Insured who received an upper extremity NCV study even though there was no indication in virtually any of the records submitted to GEICO by Patel Medical or the practitioners who referred Insureds to Patel Medical that: (i) Patel or the referring practitioner suspected that any Insured had radial neuropathy; or (ii) any Insured being tested presented with a "wrist drop" or "finger drop" condition.

191.   NCV testing of the dorsal ulnar cutaneous sensory nerve is rarely performed in legitimate clinical practice because such testing is typically only indicated when the practitioner suspects ulnar neuropathy located at the wrist, a condition which is rarely seen in legitimate clinical practice.

192.   Despite being rarely warranted in legitimate clinical practice, Patel Medical purportedly performed an NCV test of the dorsal ulnar cutaneous sensory nerve of virtually every Insured who received an upper extremity NCV study even though there was no indication in virtually any of the records submitted to GEICO by Patel Medical or the practitioners who referred Insureds to Patel Medical that Patel or the referring practitioner suspected that any Insured had ulnar neuropathy at the wrist.

193.   Further, NCV testing of the saphenous sensory nerve is rarely performed in legitimate clinical practice because such testing is typically only indicated when the practitioner suspects femoral neuropathy or a high lumbar plexopathy, which are conditions rarely seen in legitimate clinical practice.

194.   Despite being rarely warranted in legitimate clinical practice, Patel Medical purportedly performed an NCV test of the saphenous sensory nerve of virtually every Insured who received a lower extremity NCV study even though there was no indication in virtually any of the records submitted to GEICO by Patel Medical or the practitioners who referred Insureds to Patel Medical that Patel or the referring practitioner suspected that any Insured had femoral neuropathy or high lumbar plexopathy.

195.   Likewise, NCV testing of the lateral plantar motor nerve is rarely performed in legitimate clinical practice because such testing is typically only indicated when the practitioner suspects "tarsal tunnel syndrome," a rare condition where the tibial nerve is entrapped at the ankle.

196.     Despite being rarely warranted in legitimate clinical practice, Patel Medical purportedly performed an NCV test of the lateral plantar motor nerve of virtually every Insured who received a lower extremity NCV study even though there was no indication in virtually any of the records submitted to GEICO by Patel Medical or the practitioners who referred Insureds to Patel Medical that Patel or the referring practitioner suspected that any Insured had "tarsal tunnel syndrome."

197.     Finally, NCV testing of the medial plantar motor nerve is rarely performed in legitimate clinical practice because it is duplicative and clinically useless when the tibial motor nerve is also tested. The medial plantar motor nerve is a branch of the tibial motor nerve that runs through the abductor hallucis brevis muscle. Because a standard tibial motor nerve NCV test also records the response of the abductor hallucis brevis muscle, there is no basis to test both the medial plantar motor nerve and the tibial motor nerve of the same patient in the same NCV study.

198.     In keeping with the fact that Patel Medical's NCV testing was performed pursuant to a predetermined treatment and billing protocol designed solely for the purpose of maximizing Defendants' profit, Patel Medical performed NCV tests of the medial plantar motor nerve of virtually every Insured who received a lower extremity NCV study despite the fact that each of those lower extremity studies also purportedly performed an NCV test of the tibial motor nerve.

199.     Because Patel Medical also allegedly performed an NCV test of the tibial motor nerve in virtually all of the NCV studies where it also performed an NCV test of the medial plantar motor nerve, Patel Medical's NCV tests of the medial plantar motor nerve in each of these Insureds was duplicative of the NCV test of the tibial motor nerve and, consequently, clinically useless.

200.     Patel and Patel Medical knew that performing NCV tests of the radial motor, dorsal ulnar cutaneous sensory, saphenous sensory, lateral plantar motor, and medial plantar motor nerves

was not medically necessary and/or not warranted by the patient's presenting problems. Even so, Patel and Patel Medical disregarded proper clinical NCV testing standards in favor of fraudulently carrying out the predetermined treatment and billing protocol that they, in coordination with the John Doe Defendants, devised in order to maximize their financial gain.

201.    As discussed above, Patel and Patel Medical routinely purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds have radiculopathies or any other medical condition.

202.    What is more, the decision of which peripheral nerves to evaluate in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

203.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

204.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers assessed with NCV tests should vary from patient-to-patient.

205.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the study in response to new information obtained.

206.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

207.    Even so, Patel and Patel Medical did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

208.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in nearly all of the NCV test claims identified in Exhibit "1."

209.    Specifically, Patel Medical purported to test the following identical peripheral nerves and nerve fibers in virtually every Insured who received an upper extremity NCV test, regardless of any particular Insured's individual symptoms: (i) left and right median motor nerves; (ii) left and right ulnar motor nerves; (iii) left and right radial motor nerves; (iv) left and right median sensory nerves; (v) left and right radial sensory nerves; (vi) left and right ulnar sensory nerves; and (vii) left and right dorsal ulnar cutaneous sensory nerves.

210.    Likewise, Patel Medical purported to test the following identical peripheral nerves and nerve fibers in virtually every Insured who received a lower extremity NCV test, regardless of any particular Insured's individual symptoms: (i) left and right lateral plantar motor nerves; (ii) left and right medial plantar motor nerves; (iii) left and right peroneal motor nerves; (iv) left and right tibial motor nerves; (v) left and right superficial peroneal sensory nerves; (vi) left and right sural sensory nerves; and (vii) left and right saphenous sensory nerves.

211.    Though Patel and Patel Medical's NCV tests were allegedly provided to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history and examination performed to create a foundation for the EDX testing. In actuality, the NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

212.    At bottom, Patel Medical's cookie-cutter approach to the NCV tests it purported to provide to Insureds was not based on medical necessity. Instead, it was designed solely to

maximize the charges that Patel Medical could submit to GEICO and other insurers, thereby maximizing Defendants' ill-gotten profits, without regard for genuine patient care.

### e.    The Fraudulent Charges for EMG Tests

213.    As part of their pre-determined fraudulent treatment and billing protocol, Patel Medical also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests.

214.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

215.    According to the Recommended Policy, in 90 percent of all patients, it is not necessary to perform EMGs on more than two limbs in order to diagnose a radiculopathy.

216.    Patel Medical purported to perform EMGs to Insureds to determine whether the Insureds suffered from radiculopathies and neuropathies. In actuality, the EMGs were provided – to the extent they were provided at all – as part of Defendants' pre-determined fraudulent treatment protocol designed to maximize the billing that Patel Medical could submit for each Insured.

217.    There are many different muscles in the arms and legs that can be evaluated using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from

patient-to-patient.

218.    As with their NCV tests, Patel and Patel Medical did not tailor the EMGs they purported to perform to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

219.    Furthermore, even if there were any need for any of the EMGs, the nature and number of the EMGs that Patel Medical purported to perform frequently grossly exceeded the maximum number of limbs tested – i.e., EMGs of two limbs – that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

220.    Nevertheless, Patel Medical routinely purported to perform EMGs on all four limbs on the overwhelming majority of Insureds, in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that Patel Medical could submit or cause to be submitted to GEICO and other insurers, and solely to maximize the profits that Defendants could reap from each Insured.

221.    In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of Patel Medical's EMG tests were not incorporated into any Insured's treatment plan, and they played no genuine role in the treatment or care of the Insureds.

### f.      The Implausible Radiculopathy Diagnoses

222.    Radiculopathies, whether single or multiple level, occur in only nineteen (19%) percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Dr. Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

223.    Furthermore, the accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore likely represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

224.    As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be lower than 19 percent.

225.    Nonetheless, Patel Medical purported to diagnose at least single-level cervical and lumbar radiculopathies in most of the Insureds to whom it purported to provide EDX testing.

226.    Moreover, Patel Medical often diagnosed Insureds with bilateral cervical radiculopathy or bilateral lumbar radiculopathy, and sometimes both.

227.    However, according to the 2009 study published by Drs. Braddom, Rivner, and Spitz, bilateral cervical radiculopathy was present in only 1% of motor vehicle accident victims and bilateral lumbar radiculopathy was present in only 5% of motor vehicle accident victims.

228.    In keeping with the fact that Patel Medical's billing for EDX testing was fraudulent and that Patel Medical sought to diagnose nearly every Insured with radiculopathy as part of Defendants' cookie cutter predetermined treatment protocol and not because any Insured actually had radiculopathy, Patel Medical purported to diagnose bilateral cervical and bilateral lumbar radiculopathies in substantially more than 5% of its patients following its alleged performance of EDX testing.

229.    Patel and Patel Medical rendered these pre-determined radiculopathy diagnoses to create the appearance of severe injuries because without radicular injuries being present, there would be little to no justification for the continued treatment of the patients at the Clinics where

Patel Medical performed services. In addition, absent Patel Medical's continued finding of radicular injuries, the unlicensed individuals and/or healthcare providers who "brokered" or "controlled" access to patients at the Clinics would no longer continue to maintain the illegal kickback and referral arrangements with Patel Medical, thereby cutting off Patel and Patel Medical's ability to profit from the fraudulent scheme.

### 5. The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

230.  Patel and Patel Medical also purported to subject many Insureds to medically unnecessary, experimental services styled as extracorporeal shockwave therapy ("ESWT") "treatments" that were, in reality, medically unnecessary, experimental, and non-reimbursable Radial Pressure Wave Therapy ("RPWT") services.

231.  Patel and Patel Medical's decision to bill for ESWT, which was made in coordination with John Doe Defendants, was part of an effort to capitalize on material changes to the New York Workers' Compensation Fee Schedule ("Fee Schedule") that were adopted by the New York Department of Financial Services and made applicable to New York no-fault claims effective October 1, 2020. Among the changes that went into effect, the Fee Schedule for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (CPT code 0101T) with a "BR" or by-report code designation, meaning that a definitive reimbursement amount had not previously been established. Prior to October 1, 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – genuine ESWT services require considerable investment, including direct involvement by a physician in the performance of the service and use of physical equipment this is very costly and not typically portable.

232.     CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.

233.     Additionally, and as noted in the Fee Schedule, CPT code 0101T (i) is scheduled to be paid using the conversion rate for surgical services; and (ii) does not distinguish between a professional component and technical component, thus confirming that the service needs to be performed by a licensed physician to be reimbursable.

234.     Patel Medical's billing under CPT code 0101T generally resulted in charges of approximately $700.00 for each ESWT treatment that it purported to provide.

235.     Patel Medical's billing for ESWT is fraudulent for several independent reasons.

236.     First, Patel Medical's charges for ESWT were fraudulent in that the unlicensed technicians, often with little to no supervision from Patel, rarely, if ever, actually provided ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the unlicensed technicians performed Radial Pressure Wave Therapy ("RPWT") on the Insureds. RPWT is performed with a machine that uses compressed air to generate low-energy acoustic waves and is incapable of generating a true shock wave. Accordingly, RPWT does not satisfy the requirements of CPT code 0101T, which is reserved for "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy." (emphasis added).

237.     At all times, Patel and Patel Medical knew that, on each occasion where the unlicensed technicians purportedly performed RPTW on an Insured, Patel Medical's subsequent billing for ESWT under CPT code 0101T was false and fraudulent.

238.     Second, Patel Medical's ESWT charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature. In

fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there is a dearth of peer-reviewed medical literature establishing the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it is not reasonable and necessary for the treatment of musculoskeletal conditions and, therefore, not covered.

239.    In keeping with the fact that ESWT for the treatment of musculoskeletal conditions is not a legitimate treatment option: (i) Aetna insurance company considers ESWT experimental and investigational for the treatment of low back pain, lower limb conditions, and other musculoskeletal indications and, as such, does not cover it; (ii) UnitedHealth Group Incorporated care does not cover ESWT for the treatment of musculoskeletal or soft tissue indications due to insufficient evidence of its efficacy in those applications; (iii) the Blue Cross Blue Shield Association does not cover ESWT for the treatment of musculoskeletal conditions because it is considered investigational; and (iv) Cigna considers ESWT experimental, investigational, or unproven for any indication, including the treatment of musculoskeletal conditions and soft tissue wounds, and therefore does not cover it.

240.    Despite ESWT's experimental nature, the lack of peer reviewed studies establishing ESWT's effectiveness, and the lack of ESWT's approval by regulatory authorities or major health insurers, Patel Medical nevertheless purported to perform ESWT treatments on the vast majority of Insureds purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

241.    Third, Patel Medical billed for ESWT pursuant to a predetermined treatment protocol designed to maximize profit and pursuant to illegal kickback and referral arrangements that disregarded patient care.

242.    In keeping with that fact, the manner in which Patel Medical implemented its ESWT treatment and billing protocols resulted in Patel Medical submitting billing under CPT code 0101T that was clearly excessive.

243.    In that regard, Patel Medical billed GEICO for at least one unit of ESWT under CPT code 0101T regarding over 200 Insureds. For more than half of those Insureds, Patel Medical submitted billing for at least 12 units, or $8,404.68, of ESWT per Insured.

244.    Worse, for at least 30 Insureds, Patel Medical submitted billing to GEICO for ESWT alone amounted to more than $25,000.00, or more than half of the Insureds' entire $50,000.00 in New York No-Fault Benefits. Such billing is egregious and excessive by any standard and cannot be explained by any legitimate treatment protocol or genuine desire to care for any Insured; rather, the extent of Patel Medical's excessive billing is explained only by Defendants' greed and disregard for whether the fraudulent billing resulted in Insureds exhausting their available No-Fault Benefits, resulting in Insureds being unable to obtain coverage for other legitimate care.

245.    For example:

(i)     Regarding Insured MC, Patel Medical submitted billing for ESWT totaling $30,116.77, consisting of a total of 43 units under CPT code 0101T that was purportedly rendered over the course of 35 different dates of service.

(ii)    Regarding Insured DF, Patel Medical submitted billing for ESWT totaling $29,416.38, consisting of a total of 42 units under CPT code 0101T that was purportedly rendered over the course of 33 different dates of service.

(iii)  Regarding Insured SL, Patel Medical submitted billing for ESWT totaling $28,015.60, consisting of a total of 40 units under CPT code 0101T that was purportedly rendered over the course of 31 different dates of service.

(iv)  Regarding Insured DF, Patel Medical submitted billing for ESWT totaling $27,315.21, consisting of a total of 39 units under CPT code 0101T that was purportedly rendered over the course of 29 different dates of service.

(v)  Regarding Insured VA, Patel Medical submitted billing for ESWT totaling $26,614.82, consisting of a total of 38 units under CPT code 0101T that was purportedly rendered over the course of 33 different dates of service.

(vi)  Regarding Insured AB, Patel Medical submitted billing for ESWT totaling $26,614.82, consisting of a total of 38 units under CPT code 0101T that was purportedly rendered over the course of 38 different dates of service.

(vii)  Regarding Insured LB, Patel Medical submitted billing for ESWT totaling $25,914.43, consisting of a total of 37 units under CPT code 0101T that was purportedly rendered over the course of 27 different dates of service.

(viii)  Regarding Insured KC, Patel Medical submitted billing for ESWT totaling $25,914.43, consisting of a total of 37 units under CPT code 0101T that was purportedly rendered over the course of 34 different dates of service.

(ix)  Regarding Insured BJ, Patel Medical submitted billing for ESWT totaling $25,914.43, consisting of a total of 37 units under CPT code 0101T that was purportedly rendered over the course of 35 different dates of service.

(x)  Regarding Insured HV, Patel Medical submitted billing for ESWT totaling $25,914.43, consisting of a total of 37 units under CPT code 0101T that was purportedly rendered over the course of 34 different dates of service.

246.  In keeping with the fact that Patel Medical rendered the ESWT "treatments" pursuant to a fraudulent pre-determined treatment protocol, the ESWT "treatments" that Patel Medical allegedly performed were not tailored to any individual Insured's particular circumstances, and virtually none of the medical records submitted by Patel Medical contain any patient-specific assessment of the Insureds' response to such "treatments."

247.    Upon information and belief, the RPWT machines used by Patel Medical had a range of pressure intensity, pulse, and frequency settings. These settings ostensibly exist so that the treatment can be tailored to the needs of each individual patient.

248.    Yet, the "ESWT Therapy Note" form that Patel Medical submitted for the overwhelming majority of Insureds contained the same boilerplate language that the Insured had not responded to conservative treatment, recommended that ESWT be provided "1-2 times a week" for many weeks, and represented that the ESWT was performed with the exact same settings: (i) pressure intensity of "1.8"; (ii) "2000" pulses; and (iii) at a frequency of "8.0" hertz.

249.    By way of example, the following is an excerpt from a "ESWT Therapy Note" form that Patel Medical submitted, which is representative of the overwhelming majority of "ESWT Therapy Notes" forms it submitted to GEICO:

☑ **Medical Necessity:** Patient has not responded sufficiently to conservative physical therapy so ESWT is medically necessary to Improve mobility and ROM, decrease pain, improve function and activity tolerance, break up soft tissue adhesion, decrease inflammation, increase endurance and decrease stiffness. TREATMENT TO BE PROVIDED 1-2 TIMES A WEEK FOR 6-7 WEEKS.
☑ PRESSURE __1.8 Barr___   PULSE COUNT _2000__ FREQUENCY( Hz) __8.0____

250.    Further demonstrating that Patel Medical provided ESWT treatment in order to maximize profit pursuant to a predetermined treatment protocol, Patel Medical routinely provided—to the extent any service was provided at all—the same or similar number of treatment sessions of ESWT to multiple Insureds involved in the same accident at or about the same time.

251.    For example:

(i)    Three Insureds — SU, JU, and RV – were involved in the same automobile accident on October 25, 2020. Thereafter, Patel Medical purported to render experimental ESWT to all three Insureds, with SU and JU receiving 32 sessions and RV receiving 31 sessions.

(ii)      Three insureds — DG and NG – were involved in the same automobile accident on June 27, 2021. Thereafter, Patel Medical purported to render experimental ESWT to both Insureds, with DG receiving 30 sessions and NG receiving 28 sessions.

(iii)     Two Insureds — GG and SB – were involved in the same automobile accident on July 10, 2021. Thereafter, Patel Medical purported to render experimental ESWT to both Insureds, with GG receiving 35 sessions and SB receiving 32 sessions.

(iv)     Two Insureds — MC and RAF – were involved in the same automobile accident on March 26, 2021. Thereafter, Patel Medical purported to render experimental ESWT to both Insureds, with MC receiving 20 sessions and RA receiving 27 sessions.

(v)      Two Insureds — FB and MB – were involved in the same automobile accident on June 29, 2021. Thereafter, Patel Medical purported to render experimental ESWT to both Insureds, with FB receiving 34 sessions and MB receiving 32 sessions.

(vi)     Three Insureds — SB, KS, AC – were involved in the same automobile accident on March 27, 2021.  Thereafter, Patel Medical purported to render 3 sessions of experimental EWST to all three Insureds.

(vii)    Two Insureds — JP and EJP – were involved in the same automobile accident on April 18, 2021. Thereafter, Patel Medical purported to render experimental ESWT to both Insureds, with JP receiving 11 sessions and EJ receiving 9 sessions.

(viii)   Two Insureds — LW and GG – were involved in the same automobile accident on November 29, 2020. Thereafter, Patel Medical purported to render 5 sessions of experimental EWST to both Insureds.

(ix)     Two Insureds — KC and SC – were involved in the same automobile accident on October 23, 2021. Thereafter, Patel Medical purported to render 3 sessions of experimental EWST to both Insureds.

(x)      Two Insureds — MC and LB – were involved in the same automobile accident on January 9, 2021. Thereafter, Patel Medical purported to render experimental ESWT to both Insureds, with MC receiving 35 sessions and LB receiving 27 sessions.

252.    It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require a the same or substantially similar number of experimental ESWT treatments, to the extent Patel Medical's ESWT was even medically necessary or performed at all.

253.    As with the other Fraudulent Services, Patel Medical's billing for and alleged performance of ESWT was part of Defendants' fraudulent treatment and billing protocol designed to financially enrich Defendants and carried out pursuant to Defendants' illegal kickback and referral arrangements, rather than to benefit any of the Insureds.

**D.    The Fraudulent Billing for Independent Contractor Services**

254.    The Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of Patel Medical seeking payment for services provided by individuals—specifically, unlicensed technicians—who were never employed by Patel or Patel Medical.

255.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

256.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of

the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

257.    Virtually every bill submitted to GEICO by Patel Medical represented that Patel was the "treating provider" who performed the Fraudulent Services.

258.    In reality, these representations were often false. Many of the Fraudulent Services were instead performed by individuals whom Defendants, in order to maximize their profits, treated as independent contractors rather than direct employees.

259.    As noted above, Patel falsely testified at the EUO of Patel Medical that he personally witnessed each Insured sign their respective assignment of benefits forms during the initial consultation or examination when, in fact, forged Insured signatures appeared on the numerous assignments of benefits forms submitted by Patel Medical.

260.    Upon information and belief, in keeping with the fact that Patel did not actually witness Insureds sign many of the assignment of benefits forms submitted by Patel Medical and that forged Insured signatures appeared on many assignments of benefits forms, OAT forms, and ESWT Therapy Notes submitted by Patel Medical, Patel was physically present at the Clinics far less than was represented by Patel Medical's billing submissions.

261.    The unlicensed technicians who performed services on behalf of Patel Medical typically did so with little to no supervision by Patel.

262.    Further, at the EUO of Patel Medical, Patel testified that Patel Medical paid only one individual, a receptionist, on a "1099 basis."

263.    However, in keeping with the fact that Patel Medical used independent contractors to render many of the Fraudulent Services in violation of New York law, Patel Medical issued IRS 1099-NEC forms in 2021 to multiple unlicensed technicians who performed ESWT services on behalf of Patel Medical.

264.    By electing to treat the healthcare professionals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the health care professionals.

265.    Because many of the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Patel or Patel Medical, Patel Medical never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for those Fraudulent Services, in addition to all others identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

266.     To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through Patel Medical to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

267.     The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)      The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)     The NF-3, HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented and exaggerated the level, nature, and necessity of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv)     With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Patel, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

**IV.**   **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

268.   Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

269.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

270.   Specifically, the Defendants knowingly misrepresented and concealed facts related to Patel Medical in an effort to prevent discovery of the fact that the Defendants unlawfully paid kickbacks in exchange for patient referrals.

271.   Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully paid kickbacks in exchange for patient referrals.

272.   Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

273.   In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed technicians and/or others who rendered services on behalf of Patel Medical in order to prevent GEICO from discovering that the unlicensed technicians and/or others performing many of the Fraudulent Services were not employed by Patel Medical.

274.     Patel Medical also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

275.     The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

276.     GEICO is under statutory and contractual obligations to process claims promptly and fairly within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $711,000.00 based upon the fraudulent charges.

277.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against all Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

278.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

279.    There is an actual case in controversy between GEICO and Patel Medical regarding more than $2,253,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

280.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

281.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services – to the extent that they were provided at all – misrepresented and exaggerated the level, nature, and necessity of services that purportedly were provided to inflate the charges submitted to GEICO.

282.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services.

283.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback payments made in exchange for patient referrals.

284.    Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Patel Medical.

285.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Patel Medical.

**SECOND CAUSE OF ACTION**
**Against Patel**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

286.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

287.    Patel Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

288.    Patel knowingly has conducted and/or participated, directly or indirectly, in the conduct of Patel Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Patel Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level, nature, and necessity of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Patel Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Patel Medical's employees.  The fraudulent billings and corresponding mailings submitted to GEICO that

comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

289.    Patel Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Patel operated Patel Medical, inasmuch as Patel Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Patel Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Patel Medical to the present day.

290.    Patel Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Patel Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

291.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $711,000.00 pursuant to the fraudulent bills submitted by the Defendants through Patel Medical.

292.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Patel and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

293.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

294. Patel Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

295. Patel and John Doe Defendants are employed by and/or associated with the Patel Medical enterprise.

296. Patel and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Patel Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Patel Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level, nature, and necessity of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Patel Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Patel Medical's employees. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

297. Patel and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or

facilitating the submission of fraudulent charges to GEICO.

298.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $711,000.00 pursuant to the fraudulent bills submitted by Defendants through Patel Medical.

299.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Patel and Patel Medical**
**(Common Law Fraud)**

300.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

301.    Patel and Patel Medical intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

302.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Patel Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Patel Medical and Patel; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the

billed-for services misrepresented and exaggerated the level, nature, and necessity of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iv) in every claim, the representation that the billed-for services were provided by employees of Patel Medical, when in fact many of the billed-for services were provided by independent contractors.

303.    Patel and Patel Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Patel Medical that were not compensable under the No-Fault Laws.

304.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $711,000.00 pursuant to the fraudulent bills submitted by Defendants through Patel Medical.

305.    Patel and Patel Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

306.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Patel and Patel Medical**
**(Unjust Enrichment)**

307.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

308.    As set forth above, Patel and Patel Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

309.    When GEICO paid the bills and charges submitted by or on behalf of Patel Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

310.    Patel and Patel Medical have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

311.    Patel and Patel Medical's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

312.    By reason of the above, Patel and Patel Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $711,000.00.

## JURY DEMAND

313.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Patel, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $711,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Patel and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than

$711,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

   D. On the Fourth Cause of Action against Patel and Patel Medical, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $711,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

   E. On the Fifth Cause of Action against Patel and Patel Medical, more than $711,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: April 17, 2023

          RIVKIN RADLER LLP


        By: /s/ *Barry I. Levy*

          Barry I. Levy, Esq.
          Michael A. Sirignano, Esq.
          John P. Mulvaney, Esq.
       926 RXR Plaza
       Uniondale, New York 11556
       (516) 357-3000

       *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*