UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GOVERNMENT EMPLOYEES INSURANCE
CO., et al.,

                                        Plaintiffs,

                –against–

BHARGAV PATEL, M.D., et al.,

                                        Defendants.

Case No.: 1:23-cv-02835-KAM-PK

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO STAY AND ENJOIN DEFENDANTS' COLLECTIONS PROCEEDINGS**

Respectfully submitted,

RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556-0926
RR File No.:  005100-03448
Telephone:     (516) 357-3000
Facsimile:      (516) 357-3333

*Counsel for Plaintiffs Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company, and GEICO Casualty Co.*

Of Counsel:
Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joshua D. Smith, Esq.
John P. Mulvaney, Esq.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

AN OVERVIEW OF NEW YORK'S NO-FAULT LAWS ........................................... 4

STATEMENT OF RELEVANT FACTS .................................................................. 6

    I.      GEICO's Complaint and Allegations against the Defendants.................................... 6

    II.    The Defendants' Collection Proceedings ............................................................... 9

ARGUMENT ...................................................................................................... 11

    I.      The Court Should Grant GEICO's Request to Stay all Pending Collection
          Proceedings and Enjoin the Filing of Additional Collection Proceedings ............................. 11

          A.  The Standards on This Motion.......................................................................... 11

          B.  Absent the Requested Stay and Injunction, GEICO Will Suffer Irreparable Harm......... 12

          C.  GEICO Has Shown – at a Minimum – a Serious Question Going to the Merits of its
              Declaratory Judgment Claim .......................................................................... 15

              1.  The Serious Questions Regarding the Defendants' Fraudulent Treatment and Billing
                   Protocols and Use of Independent Contractors ........................................... 16

              2.  The Serious Questions Regarding Defendants' Unlawful Kickback and Referral
                   Scheme ............................................................................................... 19

          D.  The Balance of Hardships Tips in Favor of a Stay ........................................... 21

    II.    This Court Can Stay the Collection Proceedings Pending in State Court .............................. 22

    III.   The Court Should Enjoin the Defendants from Commencing Any New No-Fault Collections
          Proceedings During the Pendency of this Action................................................... 25

    IV.   GEICO Should Not be Required to Post Security for the Requested Injunction .................... 26

CONCLUSION...................................................................................................... 28

**Cases**

Allstate Ins. Co. v. Elzanaty,
    929 F. Supp. 2d 199 (E.D.N.Y. 2013) .................................................................. 12, 21, 27

Allstate Ins. Co. v. Mun,
    751 F.3d 94 (2d Cir. 2014) ........................................................................................ 9, 13

A.M. Med. Servs., P.C. v. Progressive Casualty Ins. Co.,
    101 A.D.3d 53, 953 N.Y.S.2d 219 (2d Dep't 2012) ......................................................... 18

Donohue v. Mangano,
    886 F. Supp. 2d 126 (E.D.N.Y. 2012) ............................................................................ 26

Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab., LLC,
    2020 WL 7042648 (E.D.N.Y. Dec. 1, 2020) ................................................... 12, 14, 21, 27

Gov't Emps. Ins. Co. v. AMD Chiropractic, P.C.,
    2013 WL 5131057 (E.D.N.Y. Sept. 12, 2013) ................................................................. 18

Gov't Emps. Ins. Co. v. Axial Chiropractic P.C.,
    19-cv-05570 (ENV)(SMG), D.E. 56 (E.D.N.Y. Apr. 27, 2020)........................................15

Gov't Emps. Ins. Co. v. Badia,
    2015 WL 1258218 (E.D.N.Y. Mar. 18, 2015) .......................................................... 5-6, 18

Gov't Emps. Ins. Co. v. Beynin,
    2021 WL 1146051 (E.D.N.Y. Mar. 25 2021) ................................................................... 10

Gov't Emps. Ins. Co. v. Big Apple Med. Equipment, Inc.,
    20-cv-05786 (PKC)(SJB), D.E. 52 (E.D.N.Y. Mar. 25, 2021) .....................................23, 24

Gov't Emps. Ins. Co. v. Cean,
    2019 WL 6253804 (E.D.N.Y. Nov. 22, 2019) ....................................................... 25-26, 26

Govt. Emps. Ins. Co. v Landow,
    2022 WL 939717 (E.D.N.Y. Mar. 29, 2022)..................................................................... 24

Gov't Emps. Ins. Co. v. Lexington Med. Diag. Servs., P.C.,
    2020 WL 1316644 (E.D.N.Y. Mar. 20, 2020) .................................................................... 6

Gov't Emps. Ins. Co. v. Mayzenberg,
    2018 WL 6031156 (E.D.N.Y. Nov. 16, 2018) ......................................................... 5, 26, 27

Gov't Emps. Ins. Co. v. Moshe,
    2020 WL 3503176 (E.D.N.Y. June 29, 2020) ................................................................... 27

Gov't Emps. Ins. Co. v. Tolmasov,
    602 F. Supp. 3d 380 (E.D.N.Y. 2022) .................................. 3, 11, 12, 15, 21, 22, 23, 24, 27

Gov't Emps. Ins. Co. v. Wallegood, Inc.,
    21-cv-01986 (PKC)(RLM), D.E. 36 (E.D.N.Y. July 16, 2021) .............12, 13, 15, 21, 23, 24

Gov't Emps. Ins. Co. v. Wellmart RX, Inc.,
    435 F.Supp.3d 443 (E.D.N.Y. 2020) ................................................... 12, 21, 26, 27

Gov't Emps. Ins. Co. v. Zilberman,
    2021 WL 1146086 (E.D.N.Y. Mar. 25, 2021) ............................................. 11, 12

Med. Soc'y v. Serio,
    100 N.Y.2d 854 (2003) ................................................................. 4, 5

State Farm Mut. Auto. Ins. Co. v. Herschel Kotkes, M.D., P.C.,
    2023 WL 4532460 (E.D.N.Y. July 13, 2023) ................................... 11, 12, 23, 24

State Farm Mut. Auto. Ins. Co. v Jamaica Wellness Med., P.C.,
    16-cv-4948, Minute Entry (E.D.N.Y. May 18, 2017).................................23, 24

State Farm Mut. Auto. Ins. Co. v. Mallela,
    4 N.Y.3d 313 (2005) ...................................................................... 5

State Farm Mut. Auto. Ins. Co. v. Parisien,
    352 F. Supp. 3d 215 (E.D.N.Y. 2018) ......................................... 9, 10, 11, 14, 15, 23, 24, 25


**Statutes and Other Authorities**

8 N.Y.C.R.R. § 29.1(b)(2) .......................................................................... 6

11 N.Y.C.R.R. § 65 .................................................................................. 4

11 N.Y.C.R.R. § 65-3.16(a)(12) .................................................................... 5

11 N.Y.C.R.R. § 65-4.1 .............................................................................. 9

11 N.Y.C.R.R. § 65-3.9(1)(a) ...................................................................... 21

28 U.S.C. § 1651 ................................................................................... 22

28 U.S.C. § 2283 ................................................................................... 22

Fed. R. Civ. P. 65 ............................................................................... 1, 26

N.Y. Educ. Law § 6530(17) ......................................................................... 6

N.Y. Ins. Law § 403 ................................................................................. 5

N.Y. Ins. Law § 5101 ................................................................................ 4

N.Y. Ins. Law § 5102(a) ............................................................................. 4

N.Y. Ins. Law § 5106(b) ............................................................................. 9

## PRELIMINARY STATEMENT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs") respectfully submit this memorandum of law in support of their motion for an order, pursuant to Fed. R. Civ. P. 65 and the Court's inherent power:

(i)      staying all No-Fault insurance collection arbitrations pending before the American Arbitration Association ("AAA") and state court collection lawsuits that have been commenced by or on behalf of Defendant Patel Medical Care, P.C. ("Patel Medical"), pending disposition of GEICO's claims in this action; and

(ii)     enjoining Patel Medical, and anyone acting or purporting to act of its behalf, from commencing any new No-Fault insurance collection arbitrations or state court collection lawsuits against GEICO, pending disposition of GEICO's claims in this action.

There is good cause for this motion. GEICO's Complaint sets forth in significant detail how Defendants used Patel Medical as a vehicle to submit large volumes of fraudulent No-Fault insurance billing to GEICO for medically unnecessary, experimental, excessive, illusory, and otherwise non-reimbursable healthcare services, which in many instances were never actually provided and were billed by Patel Medical based on treatment records with forged patient signatures.[1] Specifically, Defendants submitted more than $3.4 million in fraudulent billing to GEICO seeking payment for medically unnecessary initial consultations, initial and follow-up examinations, outcome assessment testing, radial pressure wave therapy that was falsely billed as extracorporeal shockwave therapy, nerve conduction velocity testing, and electromyography

---

[1] To de-identify the patients' health information, GEICO redacted the numerous examples of forged patient signatures in its publicly filed Complaint. See D.E. 1 ¶¶ 42, 45. Because GEICO relies on these examples to support its present motion, an unredacted copy of GEICO's Complaint will be filed under seal and will be provided to the Court in hard copy once the motion is fully briefed.

studies (collectively, the "Fraudulent Services") purportedly provided to automobile accident victims covered by policies of insurance issued by GEICO ("Insureds"). See D.E. 1, passim.

In addition to forging patient signatures, lying to GEICO and other automobile insurers about the services actually being performed and that they were performed by licensed healthcare practitioners, and performing medically unnecessary Fraudulent Services, Defendants Patel Medical and Bhargav Patel, M.D. ("Patel") entered into illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals – including John Doe Defendants "1" - "10" – who controlled access to patients at the locations from which Patel Medical rendered the Fraudulent Services (the "Clinics") and/or were responsible for "brokering" access to patients. In addition, many of the Fraudulent Services were rendered by independent contractors, including persons that were not even licensed healthcare professionals. In sum, Defendants falsely represented that Patel Medical was entitled to receive No-Fault insurance benefits so that they could exploit Insureds for financial gain without regard to genuine patient care.

Based on these allegations, which are supported by specific facts in the Complaint and representative examples, GEICO asserts claims against the Defendants for civil RICO violations, common law fraud, and unjust enrichment seeking to recover damages based on the payments it voluntarily made in reliance on the Defendants' fraudulent billing. In addition to monetary damages, GEICO seeks a declaration that it is not legally required to pay reimbursement for any pending No-Fault insurance claims that have been submitted by or on behalf of Patel Medical.

After this action was filed, and as part of the fraudulent scheme, Defendants began filing hundreds of "No-Fault" collection proceedings seeking payment for claims denied or disputed by GEICO, as part of the fraudulent scheme and in a conscious effort to undermine the Court's ability to fully adjudicate GEICO's declaratory judgment claim. Because Defendants know that they face

better odds of recovering on their fraudulent claims when they are presented and reviewed in isolation, each collection proceeding typically seeks reimbursement of a small number of bills involving a single Insured. In keeping with Defendants' apparent goal to undercut this case with a legion of piecemeal collection proceedings, Defendants did not file all outstanding bills for each Insured into one collection proceedings. Instead, Defendants typically divided up their outstanding bills per Insured into multiple collection proceedings as part of that effort. Indeed, for at least 50 of the Insureds, Defendants have filed five or more collection proceedings per Insured.

In total, the Defendants are currently pursuing collection of more than $2,675,000.00 from GEICO, spread across approximately 607 collections proceedings, consisting of 2 No-Fault arbitration proceedings pending before the AAA and 605 individual lawsuits pending in New York State civil court. See Declaration of Kathleen Asmus ("Asmus Decl.") ¶ 6. However, the individual bills at issue in these underlying collection actions are the very same claims that are the subject of GEICO's declaratory judgment claim; thus, such matters would be considered *res judicata* vis-à-vis this action. By contrast, the federal action permits GEICO a full and fair opportunity to demonstrate what is alleged in the Complaint and detailed below: when viewed collectively, the fraudulent nature of the Defendants' billing is readily apparent.

As this Court recognized when granting a similar request for a stay in Gov't Emps. Ins. Co. v. Tolmasov, 602 F. Supp. 3d 380 (E.D.N.Y. 2022), numerous Courts within this district – in highly analogous No-Fault insurance fraud cases and under virtually identical circumstances – have stayed pending No-Fault collections proceedings, including arbitrations before AAA and lawsuits in state courts, and enjoined the commencement of new No-Fault collections arbitrations and lawsuits pending the disposition of a plaintiff-insurer's fraud-based and declaratory judgment claims. That same result is warranted here.

Through the detailed allegations of fraud in the Complaint, together with the exhibits annexed thereto, and the facts set forth in the declarations of John P. Mulvaney, Esq. and Kathleen Asmus, GEICO has demonstrated – at the very least – serious questions going to the merits of its declaratory judgment claim. Moreover, GEICO will be irreparably harmed if the Defendants are permitted to continue to pursue their pending collection proceedings during this action, as the collection proceedings all concern the very claims that are the subject of Plaintiffs' declaratory judgment claim and will, if not stayed, present a high risk of inconsistent judgments and waste considerable time and resources resulting from simultaneous litigation of hundreds of fragmented collection proceedings in a variety of fora. Furthermore, the Defendants will not suffer any hardship as the result of a temporary stay of their collection activities during the pendency of this action.

For these reasons, Plaintiffs' motion should be granted in its entirety.

## AN OVERVIEW OF NEW YORK'S NO-FAULT LAWS

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds. No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services. See N.Y. Ins. Law § 5102(a). An Insured can choose to assign these No-Fault Benefits to healthcare providers of goods or services in exchange for those goods or services and the providers can then collect on those No-Fault benefits for payment.

Under the No-Fault statutory framework, insurers are given only 30 days to review and investigate claims before paying those claims without the risk of penalty for denying or delaying a claim. Med. Soc'y v. Serio, 100 N.Y.2d 854, 861 (2003). The No-Fault Laws have been

consistently targeted as mechanisms for fraudulent monetary gain by medical personnel and lay persons alike. As noted by the New York Court of Appeals, it has been common for "ringleaders (often associated with organized crime) [to] purchase minimum automobile insurance, perhaps under a fraudulent name, on wrecked or salvaged vehicles, and recruit others to fill up the vehicles and participate in staged accidents (typically sideswipes or fender benders)," with the purported victims then "steered to corrupt medical clinics called 'medical mills', where they feigned aches, pains and soft tissue injuries. The medical mills would then generate stacks of medical bills for each passenger, detailing treatments and tests that were unnecessary or never performed." Id.

Accordingly, eligibility requirements were put into place in order to curb "the rapidly growing incidences of fraud in the no-fault regime." State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 n.2 (2005). "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime . . . ." N.Y. Ins. Law § 403. Further, a healthcare service provider is not eligible to collect No-Fault benefits if it "fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . ." 11 N.Y.C.R.R. § 65-3.16(a)(12).

For instance, "[t]o be eligible for benefits, a medical services corporation (1) must be owned by a physician who actually engages in the practice of medicine through that corporation, (2) may not bill for services provided by physicians who are not employees of the corporation, such as independent contractors, and (3) may not pay kickbacks to third parties for the referral of insureds." See Gov't Emps. Ins. Co. v. Mayzenberg, 2018 WL 6031156, at *2 (E.D.N.Y. Nov. 16, 2018) (internal citations omitted); Gov't Emps. Ins. Co. v. Badia, 2015 WL 1258218, at *6

(E.D.N.Y. Mar. 18, 2015). Prohibited kickbacks include more than a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party." See N.Y. Educ. Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

Furthermore, healthcare providers are not entitled to No-Fault Benefits if the goods or services are not medically necessary, or the billing codes mispresent what services or goods were provided to the Insureds. See Gov't Emps. Ins. Co. v. Lexington Med. Diag. Servs., P.C., 2020 WL 1316644, at *5 (E.D.N.Y. Mar. 20, 2020).

## STATEMENT OF RELEVANT FACTS

### I. GEICO's Complaint and Allegations against the Defendants

GEICO filed this action on April 17, 2023. See D.E. 1. Plaintiffs respectfully refer the Court to the Complaint for the full contours of the Defendants' fraudulent scheme. Briefly, GEICO's Complaint details a widescale fraudulent scheme through which the Defendants defrauded GEICO out of millions of dollars. For instance, GEICO alleges that:

(i)   Defendants used Patel Medical to bill GEICO for millions of dollars in charges for the medically unnecessary Fraudulent Services, all designed to maximize the Defendants' profits rather than to treat or otherwise benefit the Insureds to whom those services were supposedly provided. See D.E. 1, passim.

(ii)  In many instances, Defendants submitted treatment records with forged Insured signatures in order to create the appearance that the Insureds had received a service from Patel Medical when, in reality, the Fraudulent Services were never actually provided. See D.E. 1 ¶¶ 41-46.

(iii) Defendants provided the Fraudulent Services – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and as a result of a series of unlawful kickback and referral arrangements that Defendants entered into in order to obtain access to Insureds for which Patel Medical could submit bills for the Fraudulent Services. See D.E. 1 ¶¶ 48-69.

(iv)  Those Fraudulent Services – to the extent provided at all – were provided by the Defendants pursuant to fraudulent pre-determined treatment and billing protocols designed to maximize Patel Medical's billing by using billing codes that

misrepresented and/or exaggerated the level, nature, and necessity of the Fraudulent Services. <u>See</u> D.E. 1 ¶¶ 70-253.

(v)    in many cases, the Fraudulent Services – to the extent provided at all – were not performed by Patel or Patel Medical's employees, but by independent contractors as well as persons who were <u>not</u> licensed healthcare professionals. <u>See</u> D.E. 1 ¶¶ 254-265.

These allegations are not pleaded in a vacuum. Rather, the Complaint sets forth considerable, detailed factual context for the allegations, including numerous, claim-specific examples of the Defendants' fraudulent misrepresentations, detailing the "who, what, when, where, and why" of many of the Defendants' discrete fraudulent acts. <u>See</u>, <u>e.g.</u>, D.E. 1, ¶¶ 42, 45 (identifying numerous instances where Insureds' signatures were forged on treatment records submitted by Patel Medical); ¶ 49 (identifying the specific Clinics from which Patel Medical operated); ¶ 132 (i)-(x) (identifying specific examples of instances in which Patel Medical billed for a follow-up examination performed less than 5 days after the prior follow-up examination); ¶ 157 (i)-(x) (identifying specific examples of instances of Defendants' "Upper Extremity First" protocol whereby Patel Medical virtually always performed upper extremity EDX testing prior to performing lower extremity EDX testing); ¶ 185 (i)-(x) (identifying specific examples showing how Defendants' used their "Upper Extremity First" protocol to unbundle Patel Medical's charges for the NCV portion of the EDX testing); ¶¶ 187-99 (identifying specific nerves that are rarely tested in legitimate clinical practice but for which Patel Medical routinely billed, setting forth the specific clinical requirements to test for such nerves, and demonstrating that Patel Medical billed for testing these nerves regardless of whether the clinical requirements were met); and ¶ 245 (i)-(x) (identifying specific instances where Patel Medical billed in excess of $25,000.00 for experimental, medically unnecessary extracorporeal shockwave therapy ("ESWT") allegedly provided to each insured (a) by unlicensed technicians not legally permitted to perform the

services, and (b) falsely claiming that ESWT was being provided in the first place when, in fact, the service provided by the unlicensed technicians were actually radial pressure wave therapy ("RPWT"), was not reimbursable. Moreover, the Complaint attaches, as Exhibit "1", a large representative sample of the Defendants' fraudulent submissions to GEICO through Patel Medical – complete with the claim number, date of mailing, service date, type of document mailed, procedure code, service date, and charge for more than 5,000 of the Defendants' fraudulent submissions.

Based on these allegations, GEICO asserts claims against the Defendants for civil RICO violations, common law fraud, and unjust enrichment. GEICO seeks recovery of at least $711,000.00 that was paid in reliance on Defendants' fraudulent billing through Patel Medical. See D.E. 1 ¶¶ 286-312. Additionally, GEICO seeks a declaration that Defendants have no right to receive payment on pending and unpaid No-Fault billing. See id. ¶¶ 278-285.

Notably, Defendants' fraudulent scheme is ongoing through the present as Defendants continue to submit bills to GEICO through Patel Medical. Specifically, Defendants' total billing to GEICO now totals over $3.8 million, representing more than $400,000.00 in additional billing to GEICO for the Fraudulent Services since the filing of the Complaint. See D.E. 1 ¶ 2; Asmus Decl. ¶ 5.

Prior to bringing this motion, Plaintiffs formally requested that Defendants voluntarily agree to a stay – because such stays have routinely been court-ordered or agreed to in multiple other analogous cases – in an effort to avoid the court's involvement. Despite several attempts, to date the Defendants have failed to respond to Plaintiffs' request, thereby necessitating the filing of this motion, presumably because of their attempt to leverage GEICO and because the law firm

representing Patel in this action is the same firm that filed the more than six hundred (600) collection proceedings after this action was filed.

## II.    **The Defendants' Collection Proceedings**

In New York, healthcare providers such as the Defendants, as assignees of benefits of insureds injured in automobiles accidents, may submit disputes regarding non-payment of individual bills to arbitration or bring a civil action in New York civil court. See N.Y. Ins. Law §5106(b); 11 N.Y.C.R.R. §§ 65-4.1, et seq. New York's arbitration process for no-fault coverage "is an expedited, simplified affair meant to work as quickly and efficiently as possible." Allstate Ins. Co. v. Mun, 751 F.3d 94, 99 (2d Cir. 2014). No-fault arbitrators typically conduct one hearing after another, generally in 15-minute intervals. Therefore, in the context of no-fault arbitrations, "[d]iscovery is limited or non-existent [, and c]omplex fraud and RICO claims . . . cannot be shoehorned into this system." Id. In this setting, it is impractical for an arbitrator to adequately consider a complex scheme involving the performance of thousands of fraudulent services and payment of kickbacks for patient referrals occurring in connection with numerous individual no-fault claims over extended periods of time.

No-fault proceedings in New York civil courts are likewise impractical vehicles to resolve claims stemming from complex fraudulent schemes. See State Farm Mut. Auto. Ins. Co. v. Parisien, 352 F. Supp. 3d 215, 221 (E.D.N.Y. 2018). Although there is some ability to conduct discovery in civil court, the amount in controversy, the limited nature of the disputed billing/healthcare services in each case, and the huge volume of cases pending in the civil court system, limit the court's ability to address complex fraud claims spanning multiple insureds, multiple healthcare providers, and multiple bills over lengthy periods of time – especially in cases such as this that involve systematic patterns of fraudulent treatment and billing that may not be

evident based on a review of an individual claim involving an individual bill, insured, and healthcare provider. See id. at 223-229; Asmus Decl. ¶¶ 10, 17.

As other Courts in this District have noted, complex fraud cases – such as the present case – involving "allegations of systemic fraud . . . cannot be meaningfully pursued in no-fault insurance proceedings." Gov't Emps. Ins. Co. v. Beynin, 2021 WL 1146051, at *6 (E.D.N.Y. Mar. 25 2021); see also Parisien, supra, 352 F. Supp. 3d at 229 ("Facially legitimate treatments may be provided with little variance across multiple patients, but it is only by analyzing the claims as a whole that the irresistible inference arises that the treatments are not being provided on the basis of medical necessity . . . .").

The Defendants, knowing that the no-fault collections proceedings effectively prevent GEICO from addressing the complex fraud issues presented in GEICO's Complaint and that the fraudulent treatment protocols they employed are not readily evident from the review of a few bills, continue to pursue collection of the individual bills through numerous individual no-fault collections proceedings. Logically, Defendants should welcome the efficiency of having their piecemeal claims for payment against GEICO adjudicated in a single forum. They resist doing so, however, because, as alleged in GEICO's Complaint, piecemeal collection efforts are an extension of Defendants' fraudulent conduct, see D.E. 1 ¶¶ 8, 274-75, and because they know that their fraudulent and unlawful practices will be laid bare through the discovery that is available in this federal action.

Presently, Patel Medical is currently prosecuting 607 collection proceedings (2 arbitrations and 605 lawsuits) against GEICO, which are pending before the AAA or in various New York civil covers, seeking to recover, collectively, more than $2,675,000.00. Almost all of Patel Medical's collection proceedings were filed after commencement of the instant action. Further,

these proceedings seek to collect on the very charges that are the subject of GEICO's declaratory judgment claim in the present case. [2] See Asmus Decl. ¶¶ 6-7.

## ARGUMENT

I. **The Court Should Grant GEICO's Request to Stay all Pending Collection Proceedings and Enjoin the Filing of Additional Collection Proceedings**

A. **The Standards on This Motion**

Numerous prior decisions within the Second Circuit, including this Court, have applied the preliminary injunction standard in determining whether to stay a defendant healthcare provider's No-Fault collection arbitrations and civil court collection lawsuits and enjoin the filing of additional collection arbitrations or civil court collection lawsuits during the pendency of a plaintiff-insurer's fraud and declaratory judgment action. As this Court stated in in Gov't Emps. Ins. Co. v. Tolmasov:

> To justify a preliminary injunction, "a movant must demonstrate (1) irreparable harm absent injunctive relief; and (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor."
> .

602 F. Supp. 3d 380, 386 (E.D.N.Y. 2022) (quoting Metro. Taxicab Bd. of Trade v. Cty. of N.Y., 615 F.3d 152, 156 (2d Cir. 2010)). See also, e.g., State Farm Mut. Auto. Ins. Co. v. Herschel Kotkes, M.D., P.C., 2023 WL 4532460, at *8 (E.D.N.Y. July 13, 2023); Gov't Emps. Ins. Co. v. Zilberman, 2021 WL 1146086, at *2 (E.D.N.Y. Mar. 25, 2021); Parisien, supra, 352 F. Supp. 3d at 215.

---

[2] Of note, following commencement of this federal action, Gary Tsirelman, P.C., the same law firm representing Defendants in this action, filed at least 602 separate state court collections actions seeking reimbursement on the same exact claims subject to GEICO's declaratory judgment cause of action.

## B. Absent the Requested Stay and Injunction, GEICO Will Suffer Irreparable Harm

GEICO will suffer irreparable harm absent a stay and injunction because it is faced with over six hundred (600) total collection actions filed by the Defendants, thereby risking potentially dozens of inconsistent awards or judgments before a multitude of judges and arbitrators that will frustrate GEICO's attempt to obtain declaratory relief in this action and waste considerable time and resources in the process.[3]

In this District, and specifically in No-Fault insurance fraud cases, it is well-established that the risk of inconsistent judgements constitutes irreparable harm. See, e.g., Tolmasov, supra, 602 F. Supp. 3d at 387 (explaining that irreparable harm may be established by, among other things, "the risk of inconsistent judgments"); Gov't Emps. Ins. Co. v. Wellmart RX, Inc., 435 F.Supp.3d 443, 449 (E.D.N.Y. 2020) (same); Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab., LLC, 2020 WL 7042648, at *4 (E.D.N.Y. Dec. 1, 2020) (same); Zilberman, supra, 2021 WL 1146086, at *1 (same); Gov't Emps. Ins. Co. v. Wallegood, Inc., 21-cv-01986 (PKC)(RLM), D.E. 36, p.9 (E.D.N.Y. July 16, 2021) (finding that irreparable harm would occur if "Defendants are permitted to continue pursuing collection actions during the pendency of this lawsuit because those actions might be, at best, inconsistent with the Court's ruling, and at worst, essentially ineffective.").

While other factors, such as waste of time and resources can support a showing of irreparable harm, the risk of inconsistent judgments alone is sufficient. As recently noted by Judge Morrison in Kotkes, M.D., P.C.:

> [T]he Court need not decide whether [the insurer's] litigation expenses, time, and energy spent defending nearly 200 parallel proceedings alone is sufficient to demonstrate

---

[3] "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Zilberman, supra, 2021 WL 1146086, at *1 (internal quotations omitted); see also Allstate Ins. Co. v. Elzanaty, 929 F. Supp. 2d 199, 221 (E.D.N.Y. 2013).

irreparable harm. The risk of inconsistent judgments that could effectively render unavailable a significant portion of the relief [the insurer] seeks is sufficient to demonstrate irreparable harm.

2023 WL 4532460, at *9. So too here, and especially so given that Defendants have filed more than six hundred (600) parallel proceedings where the amount subject to those proceedings comprises far more than merely a "significant portion of the relief" sought in this case. Indeed, Defendants' post-federal filing dump of collection proceedings concern virtually all of Patel Medical's outstanding billing and, thus, threaten to nullify GEICO's declaratory judgment claim and undermine this Court's ability to fully adjudicate GEICO's claims.

The risk of inconsistent judgments is further underscored by the fact that – in contrast to the present action – GEICO does not have a full and fair opportunity to litigate its fraud claims regarding Defendants' fraudulent behavior in New York's expedited arbitration system or in its civil courts. Regarding the former, the expedited no-fault arbitration procedure contemplates no substantive discovery in advance of the hearing, nor does it generally permit any meaningful examination or cross-examination of witnesses. See Mun, supra, 751 F.3d at 99. Regarding the latter, GEICO is unable to litigate the legitimacy of the Defendants' fraudulent treatment protocols before the overburdened New York City civil courts because any discovery would not be sufficient to cover the fraud-related allegations in the present action. In that regard, any discovery would be limited to the single claim before the New York City civil court, and the systemic fraud alleged in the Complaint is not apparent when claims are viewed on a case-by-case basis. See Wallegood, Inc., supra, p. 18-19 (granting stay of arbitrations and lawsuits and observing that allowing individual collection arbitrations and lawsuits to proceed would "nullify [GEICO's] efforts to prove fraud at a systematic level, impair a federal declaratory judgment action over which the

Court has taken jurisdiction precisely to eliminate such fragmentation, and deprive [GEICO] of an avenue towards complete relief in *any* court") (emphasis in original).

Further, this Court and others in this District have also found that the waste of time and resources inherent in proceeding simultaneously in hundreds of parallel collections proceedings may demonstrate irreparable harm. See e.g., Advanced Comprehensive Lab, supra, 2020 WL 7042648, at *5 (finding irreparable harm where collection proceedings presented "imminent and nonspeculative risks of inconsistent judgments and unnecessary expenditure of time and resources" given that all of the underlying claims could instead be resolved in the federal declaratory judgment action); Parisien, supra, 352 F. Supp. 3d at 233 ("[A]n insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action."). Here, the potential waste of time and resources is significant and obvious because Defendants are prosecuting more than six hundred (600) pending collections proceedings, all of which seek payment on the very same No-Fault insurance claims that are subject to the declaratory judgment in this action.

There is no material distinction between the cases cited above and the instant case. Here, as in above-cited cases, a plaintiff-insurer asserts various racketeering and other fraud-based claims against a purported healthcare provider and seeks a declaratory judgment to the effect that the healthcare provider should be prohibited from collecting No-Fault benefits based on its fraudulent activity and other unlawful conduct. Likewise, the Defendants have commenced a large amount of collection proceedings, through separate arbitrations and lawsuits, aimed at recovering the same No-Fault benefits that are the subject of the GEICO's declaratory judgment claim. And, tracking the cases cited above, the risk of inconsistencies between rulings in the collection

proceedings and this Court, especially its ultimate disposition of the declaratory judgment claim, threaten GEICO with irreparable harm absent the requested injunctive relief.

### C. GEICO Has Shown – at a Minimum – a Serious Question Going to the Merits of its Declaratory Judgment Claim

The detailed allegations in GEICO's Complaint leave no doubt that GEICO has shown, at a minimum, sufficiently serious questions going to the merits of GEICO's declaratory judgment claim to make them a fair ground for litigation – if not establish a likelihood of success on the merits. GEICO's Complaint sets forth considerable evidence that the Defendants were not entitled to collect on the bills submitted to GEICO.

The standards that courts have applied – in this exact context – in determining whether a plaintiff-insurer has made a showing warranting a stay are clear: "[l]ikelihood of success is not the focus at the early stages of a case such as this, because any likelihood of success inquiry would be premature. Instead, the [c]ourt looks to whether there is a serious question going to the merits to make them a fair ground for trial." <u>Parisien</u>, <u>supra</u>, 352 F. Supp. 3d 215, 234 (internal quotation omitted). This standard has been applied in numerous cases under substantially identical circumstances. <u>See</u> <u>e.g.</u>, <u>Tolmasov</u>, <u>supra</u>, 602 F. Supp. 3d 390.

A plaintiff-insurer can establish a serious question going to the merits of its declaratory judgment action through facts set forth in a detailed complaint. <u>See</u> <u>Wallegood</u>, <u>supra</u>, pp. 11-12 (finding that GEICO raised serious questions going to the merits through its 95-page Complaint that "details a fraudulent scheme involving Defendants, healthcare providers, and third parties not yet identified" and "does not rest on mere hypotheticals"); Gov't Emps. Ins. Co. v. Axial Chiropractic P.C., 19-cv-05570 (ENV)(SMG), D.E. 56, p. 17 (E.D.N.Y. Apr. 27, 2020), <u>report and recommendation adopted</u>, Docket Order (July 29, 2020).

GEICO's Complaint comprehensively details the Defendants' scheme of alleged fraudulent activity, raising "at least a serious question about a scheme of fraudulent activity" that does not by any reasonable metric "rest on mere hypotheticals." In that regard, GEICO's Complaint raises serious questions of fact going to the merits of GEICO's declaratory judgment claim that the Defendants are not entitled to No-Fault benefits for the pending and unpaid bills submitted to GEICO through Patel Medical.

In short, the allegations in GEICO's Complaint raise sufficiently serious questions going to the merits of GEICO's declaratory judgment cause of action that the Defendants are not entitled to collect No-Fault benefits on all pending and unpaid bills because: (i) the Fraudulent Services were not medically necessary and, in many instances were not provided at all and instead submitted based on forged patient signatures; (ii) to the extent the Fraudulent Services were provided, they were not medically necessary and performed pursuant to fraudulent pre-determined treatment and billing protocols; (iii) the Fraudulent Services were billed used billing codes that misrepresented and exaggerated the level, nature, and necessity of services that purportedly were provided; (iv) the Fraudulent Services were provided pursuant to the dictates of laypersons and as a result of illegal kickback payments made in exchange for patient referrals; and (v) in many instances, the Defendants' unlawfully submitted billing for Fraudulent Services performed by independent contractors.

1. **The Serious Questions Regarding the Defendants' Fraudulent Treatment and Billing Protocols and Use of Independent Contractors**

There are serious questions regarding Defendants' fraudulent treatment scheme, which was plainly designed to exploit each Insured's No-Fault Benefits and maximize the charges submitted to GEICO rather than benefit the insureds who were subjected to it. See D.E. 1, ¶¶ 70-253 and passim. Most notably, the Complaint identifies numerous specific instances where Defendants

submitted claims to GEICO with treatment records containing forged patient signatures to falsely justify charges for services that were never actually rendered. Id. ¶¶ 42, 45. In keeping with the fraudulent nature of Defendants' operations, when Patel appeared for an examination under oath ("EUO") on behalf of Patel Medical, he provided demonstrably false testimony by representing that he personally hands an assignment of benefits form to each Insured and that the Insureds sign the form in his presence. Id. at ¶ 46. This is demonstrably untrue. See id. ¶¶ 42-46.

To the extent any services were performed, the Complaint sets forth, in granular detail, how the Defendants subjected their patients to a predetermined treatment and billing protocol without regard to the patients' presenting problems. Id. ¶¶ 70-253. For example:

(i)     Paragraphs 74 through 132 detail the many ways in which Defendants misrepresented the nature and extent of their examinations to maximize the fraudulent billing that could be submitted through Patel Medical, including falsely representing that they performed "consultations" at the request of other healthcare practitioners when in fact that billing was false and the examinations were the result of illegal kickback payments, not legitimate referrals.

(ii)    Paragraphs 132(i) through 132(x) provide specific examples of instances in which Patel Medical billed for a follow-up examination performed less than 5 days after the prior follow-up examination (and sometimes even 1 day after the prior follow-up examination).

(iii)   Paragraphs 133 through 144 detail how the Defendants purported to subject Insureds to "outcome assessment testing" that was fraudulent because it was duplicative of the examinations the Defendants purported to provide and offered no medical utility in the diagnosis or treatment of the Insureds' conditions.

(iv)    Paragraphs 157(i) through 157(x) identify specific examples of instances of Defendants' "Upper Extremity First" protocol whereby Patel Medical virtually always performed upper extremity EDX testing prior to performing lower extremity EDX testing, even though there is no medical justification for such a protocol.

(v)     Paragraphs 185(i) through 185(x) identify specific examples showing how Defendants used their "Upper Extremity First" protocol to unbundle Patel Medical's charges for the NCV portion of the EDX testing in order to fraudulently maximize their billing.

(vi)     Paragraphs 187 through 197 identify specific nerves that are rarely tested in legitimate clinical practice but for which Patel Medical routinely billed as part of its NCV testing, set forth the specific clinical requirements to test for such nerves, and showed how Patel Medical billed for these nerves regardless of whether the clinical requirements were met.

(vii)    Paragraphs 230 through 252 detail how the Defendants, as part and parcel of their fraudulent "treatment" and billing protocols, billed GEICO exorbitant amounts for experimental, medically unnecessary ESWT purportedly provided to numerous Insureds when, in fact, the services provided – to the extent actually rendered – were radial pressure wave therapy, not ESWT, were provided by unlicensed technicians not lawfully permitted to perform ESWT, and therefore were not reimbursable.

(viii)   Paragraphs 245(i) through 245(x) identify specific examples of instances where Patel Medical excessively billed over $25,000.00 worth of ESWT over the course of a single Insured's treatment.

In this context, it is important to note that the nature of the predetermined fraudulent protocol to provide Fraudulent Services to Insureds would not be readily evident upon the review of a single bill in a single collection proceeding.

Moreover, the Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of Patel Medical seeking payments for services provided by independent contractors. See D.E. 1 ¶¶ 254-265. Under New York law, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors. See A.M. Med. Servs., P.C. v. Progressive Casualty Ins. Co., 101 A.D.3d 53, 62–63, 953 N.Y.S.2d 219 (2d Dep't 2012) (holding that medical professional corporations are precluded "from receiving direct payments of no-fault benefits for services rendered by independent contractors"); see also Badia, 2015 WL 1258218, at *8-9; Gov't Emps. Ins. Co. v. AMD Chiropractic, P.C., 2013 WL 5131057, at *2 (E.D.N.Y. Sept. 12, 2013) (holding that under New York law, "medical professional corporations may not seek or receive reimbursement for healthcare services provided by independent contractors, even if the independent contractor is licensed to provide the service").

Healthcare services must be provided by the professional corporations themselves, or by their employees. Even so, Patel Medical submitted charges to GEICO and other insurers for Fraudulent Services that were claimed to be performed by Patel when many of the Fraudulent Services were performed by healthcare professionals and/or unlicensed technicians who were <u>not</u> employed and by Patel. <u>See</u> D.E. 1 ¶¶ 254-265.

<b>2. The Serious Questions Regarding Defendants' Unlawful Kickback and Referral Scheme</b>

There are also serious questions regarding the Defendants' payment of illegal kickbacks in exchange for patient referrals. Specifically, the Defendants engaged in illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals who controlled or brokered access to patients. <u>See</u> D.E. 1 ¶¶ 48-69. The unlicensed laypersons and/or healthcare workers controlled the access to the patients at those clinic locations – indeed, the Defendants did not have patients of their own, and did not engage in any legitimate advertising or marketing to develop their own patient base. <u>See id.</u> Instead, in exchange for kickback payments, the Defendants were granted access to these patients allowing for the Fraudulent Services to be purportedly performed and for the Defendants to continue with their fraudulent scheme. <u>Id.</u>

The Complaint's detailed allegations regarding Patel Medical's operations and the EUO testimony of Patel Medical's owner, Patel, further support the serious questions raised regarding Defendants' kickback and referral scheme. For example, Patel is allegedly the owner of a residential building at 85-55 Little Neck Parkway, Floral Park (the "Floral Park Clinic") and converted that residential building into a medical office in 2020. <u>Id.</u> ¶ 54. As demonstrated by the photo of the Floral Park Clinic taken on October 15, 2021, the Floral Park Clinic looks like an ordinary house in Floral Park, New York, with no visible signage or any other indication that a medical office resides within. <u>See id.</u> Yet, Patel Medical managed to submit over $1.2 million in

19

billing to GEICO based on Fraudulent Services purportedly rendered from the Floral Park Clinic alone, despite the fact that: (i) Patel Medical did not advertise itself or the Floral Park Clinic to the general public; (ii) the Floral Park Clinic appears to be an ordinary residential building; (iii) the Floral Park Clinic lacks any signage that is clearly visible to passersby indicating that the Floral Park Clinic is a medical office; and (iv) the Floral Park Clinic lacks a parking lot despite being located on a busy road with limited street parking. Id. ¶ 55.

Further, Patel testified at an EUO that Patel Medical used the services of a transportation company to transport patients to the Floral Park Clinic but testified that he did not know: (i) who owned the transportation company; (ii) the name of any contact person at the transportation company; or (iii) how much Patel Medical pays the transportation company. Id. ¶¶ 56-57. Patel further testified that he learned about the transportation company from another clinic where Patel Medical rendered the Fraudulent Services located at 420 Doughty Boulevard, Inwood, New York (the "Inwood Clinic"), a clinic location that has been identified in other no-fault insurance fraud actions as being associated with healthcare providers who paid kickbacks in exchange for patient referrals. Id. ¶ 61.

At bottom, it is highly implausible to believe that a legitimate medical practice would generate millions of dollars in billing based on its decision to run a medical office out of an ordinary house, on a busy road with little street parking, with no readily visible signage, and without conducting any marketing or advertising to the general public. Yet, that is Patel Medical's story. When all of the facts are considered together, including Defendants' association with the Inwood Clinic and Patel Medical's use of the Inwood Clinic's transportation company, GEICO has, at the least, demonstrated that there are serious questions as to the merits of GEICO's declaratory judgment claims that the Defendants are not entitled to collect No-Fault Benefits

because Patel Medical's bills were the product of illegal kickback and referral arrangements with individuals who controlled access to patients (e.g., at the Inwood Clinic) and who brokered access to patients (e.g., via the transportation company at the Floral Park Clinic).

At bottom, GEICO has met its burden to demonstrate – at a minimum – sufficiently serious questions raised in this case regarding: (i) Defendants' fraudulent treatment and billing protocols and their use of independent contractors; and (ii) Defendants payment of kickbacks in exchange for patient referrals.

### D. The Balance of Hardships Tips in Favor of a Stay

The Defendants will suffer no hardship if their right to collect on their pending billing is adjudicated in a single, efficient declaratory judgment action, rather than on a piecemeal basis in a plethora of civil court proceedings with the prospect of significantly varying outcomes. See, e.g., Tolmasov, 602 F. Supp. 3d at 392; Wallegood, Inc., supra, p. 13; Advanced Comprehensive Lab., supra, 2020 WL 7042648, at *8; Wellmart RX, Inc., supra, 435 F.Supp.3d at 455.

Under the circumstances, it is logical and efficient to resolve the uniform issues that are applicable across all pending and unpaid No-Fault insurance billing in one-single forum. Especially because "granting the stay and injunction will actually save *all* parties time and resources" because "rather than adjudicating hundreds of individual claims in a piecemeal fashion, all claims can be efficiently and effectively dealt with in a single declaratory judgment action." Wallegood, Inc., supra, p. 14; see also Advanced Comprehensive Lab, supra, 2020 WL 7042648, at *8. Further, the Defendants will suffer no prejudice if their right to collect the pending billing is adjudicated in a single declaratory judgment action. In the unlikely event that the Defendants were to ultimately prevail in this matter, they would benefit from the stay as they would, "be entitled to the collection of interest at a rate of two percent every month that the No–Fault payments are overdue." Elzanaty, supra, 929 F. Supp. 2d at 222 (citing 11 NYCRR § 65–3.9(1)(a)).

As this Court found in <u>Tolmasov</u>, the balance of hardships tips in GEICO's favor because, absent an injunction, "GEICO will suffer irreparable harm because money damages will be inadequate to remedy the Plaintiffs' time and losses, and because of the risk of inconsistent outcomes" whereas Defendants "will suffer no prejudice if their right to collect the pending billing is adjudicated in a single declaratory judgment action." 602 F. Supp. 3d at 392.

## II.     This Court Can Stay the Collection Proceedings Pending in State Court

The All-Writs Act ("AWA") enables a federal court to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. Though the Anti-Injunction Act ("AIA") limits the authority of federal courts to enjoin pending, previously filed state court proceedings, the AIA contains exceptions that expressly permit a federal court to stay such pending proceedings "where necessary in aid of its jurisdiction, or to protect or effectuate its judgment." 28 U.S.C. § 2283.

As this Court correctly observed in <u>Tolmasov</u>, any challenge to GEICO's request for a stay of state court actions under the AIA "would not defeat GEICO's claim for injunctive relief at [the preliminary injunction] stage" because "[i]n recent and analogous cases . . . , courts in this Circuit have concluded that, through that exception to the AIA, the courts were authorized to stay the state court collection lawsuits . . . pending disposition of GEICO's claims in federal court." 602 F. Supp. 3d at 392.

These courts have stayed, among other things, all state court and civil court collection lawsuits pending against an insurer in virtually identical circumstances – typically relying on the "in aid of its jurisdiction" exception to the AIA. For example, in 2018, Judge Glasser granted a stay of state court collection actions in <u>Parisien</u>. There, Judge Glasser reasoned as follows:

"The gravamen of State Farm's allegations is that Defendants have systematically and concertedly administered treatments in a rote fashion, independent of the clinical needs of the patient, in such a combination as to maximize reimbursements while minimizing the

possibility of detection through the use of various controlled entities. Yet these alleged violations may not be apparent if the claims and their supporting documentation are examined in isolation on a case-by-case basis. Facially legitimate treatments may be provided with little variance across multiple patients, but it is only by analyzing the claims as a whole that the irresistible inference arises that the treatments are not being provided on the basis of medical necessity. Because it is only through this tapestry of facts that the alleged fraud comes into focus, State Farm may not as a practical matter have a fair opportunity to present its claims unless it is permitted to direct the trier of fact to all of the claims at issue. "

Parisien, supra, 352 F. Supp. 3d at 229.

Parisien is not an outlier but actually represents the prevailing view in the District. Courts in this District have regularly granted identical relief under highly analogous circumstances. See, e.g., Kotkes, M.D., P.C., supra, 2023 WL 4532460; Tolmasov, supra, 602 F. Supp. 3d at 392; Gov't Emps. Ins. Co. v. Landow, 2022 WL 939717, at *13 (E.D.N.Y. Mar. 29, 2022); Wallegood, Inc., supra, p. 19; Gov't Emps. Ins. Co. v. Big Apple Med Equipment, Inc., 20-cv-05786 (PKC)(SJB), D.E. 52, p. 6 n.6 (E.D.N.Y. Mar. 25, 2021); State Farm Mut. Auto. Ins. Co. v. Jamaica Wellness Med., P.C., 16-cv-4948, Minute Entry (E.D.N.Y. May 18, 2017).

Most recently, in Kotkes, M.D., P.C., Judge Morrison granted State Farm's motion to stay state court collection lawsuits commenced by the defendant-professional corporation. Kotkes, M.D., P.C., supra, 2023 WL 4532460, at *13. In so doing, Judge Morrison noted that "[m]any courts in this district have held that injunctions sought by insurers in this context seeking to stay pending state collection actions fall within the "in aid of jurisdiction" exception." Id. at *12. While Judge Morrison noted that "a smaller number [of courts] have taken a narrower view of this exception and declined to stay already-pending state court actions," Judge Morrison found "persuasive Judge Glasser's analysis of the "in aid of jurisdiction" exception, and its potential application beyond the advanced-class-action context, in Parisien . . . ." Judge Morrison continued: "[T]his Court concludes that the "in aid of jurisdiction" exception applies to pending no-fault

collection actions such as this one, in which an insurer-plaintiff has plausibly alleged a broad pattern of fraud in a defendant's no-fault insurance claims that are also the subject of dozens of state court actions." Id.

The reasoning set forth by the Court in Kotkes, M.D., P.C., Tolmasov, Landow, Wallegood, Big Apple, Parisien, and Jamaica Wellness is equally applicable here. In particular, with over six hundred (600) state court collection lawsuits pending against GEICO, an injunction staying those lawsuits until this action is resolved is absolutely necessary to aid the jurisdiction of this Court, prevent fragmented results, and avoid a massive drain of resources for all parties involved. Moreover, because the Defendants filed virtually all the collections proceedings after the instant action was filed, it appears that the collections proceedings were commenced for the very purpose of undermining this Court's ability to adjudicate the full scope of GEICO's declaratory judgment claim; accordingly, the injunction requested by GEICO would undoubtedly aid this Court's jurisdiction.

The nature of the allegations in this case weigh in favor of a stay of the Defendants' state court litigation as well. Specifically, GEICO has alleged that Defendants, through Patel Medical, carried out a pattern of racketeering whereby Patel Medical submitted thousands of fraudulent no-fault claims for a variety of medically unnecessary services that were rendered (to the extent rendered at all) from multiple clinic locations, often by independent contractors, pursuant to the dictates of laypersons and unlawful kickback and referral arrangements. See D.E. 1, passim. Evidence of these patterns and practices, including thousands of bills and supporting medical records, financial records, and the use of medical and financial experts, will be necessary for GEICO to vindicate its claims, but GEICO's ability to take discovery and present evidence of this

level of complexity is practically impossible in the context of defense of any single state court collection lawsuit. See, e.g., Parisien, supra, 352 F. Supp. 3d at 229.

Finally, an injunction "enjoining the state actions in this case is consistent with the purpose of the AIA, which is rooted in respect for the sovereignty of state governments over matters within their jurisdiction." Id. at 231. As Judge Glasser found in Parisien:

> No-fault fraud accounted for more than half of all fraud reports received by the State Department of Financial Services in 2017 and "is a costly and pervasive drain on the national [and statewide] healthcare system." New York State Department of Financial Services, Investigating and Combating Health Insurance Fraud 3, 5 (March 15, 2018). While the policy underlying the Anti-Injunction Act is avoidance of disharmony between federal and state systems, the exception in 2283 reflects congressional recognition that injunctions may sometimes be necessary in order to avoid that disharmony. This is just such a case. New York courts routinely stay collection actions pending declaratory judgment proceedings such as this one. Failure to issue an injunction in this case may frustrate the balance that New York has attempted to strike between efficient claims processing and rooting out fraud. Surely this does not advance the goals of federalism.

Id. at 232. (internal citations and quotations omitted).

## III. The Court Should Enjoin the Defendants from Commencing Any New No-Fault Collections Proceedings During the Pendency of this Action

The Court also should grant Plaintiffs' motion to enjoin the Defendants from commencing any new No-Fault arbitration collection proceedings or civil court collection cases in the name of Patel Medical against Plaintiffs during the pendency of this action. As noted above, the Defendants, through Patel Medical, are currently prosecuting at least six hundred (600) separate collection proceedings against GEICO, currently seeking to collect more than $2,675,000.00. Further, Defendants continue to submit billing through Patel Medical to the present day, raising the prospect that the number of pending collections proceedings will continue to balloon absent the requested injunction.

In similar situations, courts have not hesitated to enjoin filings of not only new arbitrations, but also new lawsuits. See e.g., Gov't Emps. Ins. Co. v. Cean, 2019 WL 6253804, at *4 n.3

(E.D.N.Y. Nov. 22, 2019) (enjoining defendants from commencing any no-fault insurance collection lawsuits and noting that "[i]n this case, GEICO is asking the Court to, inter alia, restrain a party from instituting state proceedings. It is well-settled that a district court may do that."); Mayzenberg, supra, 2018 WL 6031156 at *9 (same); Wellmart RX, Inc., 435 F. Supp. 3d at 456 (same).

Moreover, Courts in this District – under nearly identical circumstances – have enjoined healthcare providers from commencing additional collection arbitrations or collections pending the disposition of a claim for a declaratory judgment. See, e.g., Mayzenberg, supra, 2018 WL 6031156, at *9 ("This Court will have all claims and defenses before it necessary to rule on GEICO's declaratory judgment action and Defendants' claims that they are in fact eligible to receive No-Fault Benefits. It is in the interests of judicial economy to resolve the controversy in a single action, rather than require the parties and the lower courts to engage in piecemeal and repetitive litigation."); see also Cean, 2019 WL 6253804, at *5 ("[G]ranting the stay and injunction will actually save all parties time and resources. Rather than adjudicating hundreds of individual claims in a piecemeal fashion, all claims can be efficiently and effectively dealt with in a single declaratory judgment action.").

Accordingly, a temporary stay enjoining the Defendants from commencing or prosecuting any new no-fault collections proceedings during the pendency of this action is fully warranted.

## IV. GEICO Should Not be Required to Post Security for the Requested Injunction

This Court has the discretion to waive the security requirement of Fed. R. Civ. P. 65(c), especially where – as here – there is no proof of likelihood of actual harm. See, e.g., Donohue v. Mangano, 886 F. Supp. 2d 126, 163 (E.D.N.Y. 2012). Similarly, Courts in this district have waived Rule 65(c)'s security requirement in cases that allege fraudulent schemes involving New York's No-Fault insurance statutes and a lack of prejudice to defendants resulting from a preliminary

injunction. See, e.g., Mayzenberg, 2018 WL 6031156, at *10 ("[A]llegations of fraud on our health care system generally, and even the specific civil RICO scheme alleged here, have become too common. Preventing fraud on our health care system is also in the public's interest. In any event, the Court has already concluded that a preliminary injunction will not result in any prejudice to Defendants and would actually benefit them if all of their claims are decided in one proceeding. Therefore, the Court waives the security requirement of Rule 65(c).").

As discussed above, the requested stay and injunction will not cause the Defendants any prejudice inasmuch as – in the unlikely event that the Defendants ultimately prevail in this case – they will be entitled to collect a high rate of statutory interest on their outstanding no-fault claims. In this context, courts have discretion to waive the security requirement of Rule 65(c), especially where – as here – a movant has not demonstrated any proof of likelihood of actual harm. See, e.g., Gov't Emps. Ins. Co. v. Moshe, 2020 WL 3503176, at *4 (E.D.N.Y. June 29, 2020) (holding that GEICO "undoubtedly has the ability to pay if defendants prevail" and "[a]s such, defendants will suffer no harm from the injunction"); Elzanaty, supra, 929 F. Supp. 2d at 222 (granting injunction without requiring security).

Accordingly, as this Court has previously ruled, GEICO respectfully submits that it should not be required to post security for the requested injunction. See Tolmasov, supra, 602 F. Supp. 3d at 392-93; Advanced Comprehensive Lab, supra, 2020 WL 7042648, at *8; Wellmart RX, Inc., supra, 435 F.Supp.3d at 455-56.

## **CONCLUSION**

For the reasons stated herein, GEICO's motion should be granted in its entirety, together

with such other and further relief as to the Court may seem just and proper.

Dated: November 24, 2023
      Uniondale, New York

                     RIVKIN RADLER LLP

                     By: /s/ *John P. Mulvaney*
                          Barry I. Levy (BL 2190)
                          Michael A. Sirignano (MS 5263)
                          Joshua D. Smith (JS 3989)
                          John P. Mulvaney (JM 0154)
                     926 RXR Plaza
                     Uniondale, New York 11556
                     (516) 357-3000

                     *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4894-3228-2258, v. 7